Harold W. SCHERF, Plaintiff
and Respondent,

v.

Morris B. MYERS, Defendant
and Appellant.

Nos. 11665 and 11706.

Supreme Court of South Dakota.

Oct. 31, 1977.

Rehearing Denied Dec. 7, 1977.

832

Bruce Cutler, Aberdeen, for plaintiff and respondent.

Morris B. Myers, pro se.

DUNN, Chief Justice (on reassignment).

Defendant has appealed from a judgment entered against him following a court trial on plaintiff's action based upon an alleged conversion of certain guardianship funds. We affirm as to liability but reverse as to damages.

At the outset, we are faced with plaintiff's contention that because defendant failed to submit proposed findings of fact he is precluded from asking for a review of the sufficiency of the evidence to support the judgment. *Moody County v. Cable*, 82 S.D. 537, 150 N.W.2d 193; *In re Appeals of Bottcher*, 78 S.D. 360, 102 N.W.2d 623. In view of the defendant's timely motion for a new trial under SDCL 15–6–59(a), we will consider this case on the merits. In this nonjury trial, the court under SDCL 15–6–59(a) "may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the en-

try of a new judgment." *Oahe Enterprises, Incorporated v. Golden*, 1974, S.D., 218 N.W.2d 485.

We turn, then, to the facts established by the evidence.

Allen L. Miller, the father of Dennis Allen Miller, was killed in a farm accident on July 27, 1968. Sally Miller, Dennis' mother, had been granted a divorce from Allen Miller some time earlier in the year 1968. In August of 1968 she married Bill Meidinger, who later adopted Dennis.

Dennis Miller was the named beneficiary in a life insurance policy carried by Allen Miller. Because Dennis was only two years of age at the time of his father's death, it was necessary to have a guardian appointed to receive the proceeds of the policy. Defendant, who was then practicing law in Aberdeen, South Dakota, had represented Sally in the divorce proceedings against Allen Miller, had handled the adoption proceedings when Bill Meidenger adopted Dennis, and was then representing Sally and Bill Meidinger. He prepared a petition for letters of guardianship for plaintiff, the father of Sally Meidinger, and on January 2, 1969, plaintiff was appointed guardian of Dennis' estate.

On February 26, 1969, a check in the amount of $4,739.66, which represented the proceeds of the life insurance policy on Allen Miller's life, was mailed to defendant by the insurance company. On March 5, 1969, defendant asked plaintiff to come to his office where a conference was had among plaintiff, defendant, and Sally and Bill Meidinger. According to plaintiff's testimony, defendant brought up the matter of using some of the insurance proceeds to pay some bills owed by the Meidingers and then applying the balance of the proceeds towards the purchase price of a house and lot that the Meidingers were buying on a contract for deed. In response to defendant's proposal, plaintiff responded that he would agree that this be done if it was legal and was advised by defendant that, in plaintiff's words, " * * * it would be all right for us to do it that way." Plaintiff testified that he had never served as a guardian

before and did not learn until the following year that an accounting of the guardianship funds would have to be made. In any event, plaintiff endorsed the insurance check, and on that same day defendant deposited the proceeds of the check in an account in an Aberdeen bank by means of a printed deposit slip that identified the account simply as "Morris Myers."

In addition to the life insurance policy proceeds, Dennis Miller was the beneficiary of certain benefits payable by the Veterans Administration.

Sometime in early 1971, defendant advised plaintiff that it would be necessary to file a guardianship accounting and that plaintiff would have to borrow some money for that purpose. Defendant arranged for plaintiff to secure a loan at a local bank, and on March 11, 1971, plaintiff borrowed sufficient funds from this bank to purchase a time savings certificate in the name of the guardianship in the amount of $4,739.66. When the certificate matured in June of 1971, plaintiff cashed it and paid off the loan, paying the interest differential out of his personal funds. In June of 1972, plaintiff again borrowed funds from the same bank and purchased a savings certificate in the name of the guardianship in the amount of $5,039.11. Plaintiff paid off this second loan, which with interest then totaled $5,799.56, with his personal funds on May 14, 1974, and the bank then converted the savings certificate he had purchased in June of 1972 into a four-year certificate in the name of the guardianship, with the result that the guardianship was made whole to the extent of the funds represented by the insurance policy proceeds.

Although there is some confusion in the record on this point, apparently at some time after March 5, 1969, defendant did apply the proceeds of the insurance check on certain bills owed by Sally and Bill Meidinger. In a letter to Bill Meidinger dated January 19, 1973, defendant stated that $1,599.54 had been paid to satisfy bills, a list of which was attached to the letter, and that $2,750 had been paid on a steel build-ing purchased by the Meidingers for use in Bill Meidinger's auto salvage business located on the land that was being purchased on the contract for deed. (Plaintiff testified that he had never been asked about the payment on this building and that he would not have approved the payment had he been asked.) The letter also stated that a balance of $390.12 remained from the insurance proceeds and indicated that it had been agreed that defendant's fees for handling the custody, adoption and guardianship proceedings were to be paid from the insurance proceeds. Defendant's bills for these services, totaling $688.73, were attached to the letter.[1]

By warranty deed dated March 10, 1971, but apparently never recorded, Sally and Bill Meidinger conveyed to plaintiff the property which they were purchasing on the contract for deed described above. Apparently this deed was to serve as a security device to insure the repayment to plaintiff of the guardianship funds disbursed on the Meidingers' account, although plaintiff was named as grantee individually and not in his capacity as guardian.

Plaintiff testified that at the time he was required to borrow money to replace the guardianship funds in 1971 and 1972 he had demanded of defendant that the money be returned to the guardianship account but that defendant had made no response to the demands.

Plaintiff's testimony, both on direct and on cross-examination reveals one theme: that although plaintiff was apparently willing that the insurance proceeds be applied to pay the bills owed by his daughter and her husband and to increase the equity in the real estate that they were buying, his consent was obtained in response to defendant's suggestion that this be done and in direct reliance upon defendant's advice that it was legal and proper for plaintiff to endorse the insurance check with the authorization that defendant use the money in that manner. We think that the tenor of plaintiff's reliance upon defendant's advice

---

1. The record does not reveal what happened to the $390.12.

can best be illustrated by the following excerpts from defendant's cross-examination of plaintiff on the question of why the insurance money was not placed in the guardianship account, as plaintiff alleged he thought defendant would do:

"Q. Well, how could both of these things have been done, that is, you wanted the money in the guardianship account, and yet you wanted me to pay the money out for the things that you have previously described?

"A. All I was interested in was the legal way of doing it. I didn't care if it was a guardianship account or your account.

    \*     \*     \*     \*     \*     \*

"Q. All right. If what you say is true, then why did you turn over the funds to me to put in a guardianship account?

"A. Because you're the one that wanted it. You're the one that asked me to sign the check.

"Q. But why didn't you put it in the guardianship account yourself, and disburse the money as you testified you wanted done?

"A. Well, that was the reason I had a lawyer. I thought that was the way it should be—the way you said it should be done. I can't argue with a lawyer.

"Q. But you know better than that, don't you?

"A. I do now, yes."

The court found that plaintiff's dominion and control over the proceeds of the insurance policy had passed from plaintiff to defendant when defendant deposited the check in his personal account on March 5, 1969, and that defendant had thereafter denied plaintiff the ownership, possession, dominion and control over the insurance proceeds. The court concluded that defendant had converted those proceeds to his own use or to the use of others; that defendant had knowingly misrepresented the legality of the planned disbursement of the funds with full knowledge that plaintiff would rely upon defendant's representation, and that defendant had done so for the purpose of gaining dominion and control over the funds; and that defendant had breached his attorney-client relationship with plaintiff. The court further concluded that defendant had acted oppressively by taking advantage of plaintiff's status as a bonded guardian and by coercing plaintiff to borrow money to replace the insurance proceeds. The court also concluded that defendant had acted maliciously in taking possession and control of the insurance proceeds and the money advanced by plaintiff to facilitate the guardianship accountings.

Based upon these findings and conclusions, the court entered judgment for plaintiff in the amount of $5,846.43 compensatory damages, plus interest, attorney fees in the amount of $1,880, and exemplary damages in the amount of $10,000.

We conclude that the plaintiff is entitled to be reimbursed for his personal loss sustained in restoring the guardianship funds, but that the trial court's award of exemplary damages and attorney fees was erroneous.

■ Conversion is the act of exercising control or dominion over personal property in a manner that repudiates the owner's right in the property or in a manner that is inconsistent with such right. *Rapid Sewing Center, Inc. v. Sanders,* 79 S.D. 373, 112 N.W.2d 233; *Richstein v. Roesch,* 71 S.D. 451, 25 N.W.2d 558; 18 Am.Jur.2d, Conversion, § 1. It is immaterial that the conversion may not have benefited the defendant or that it benefited third parties. *Richstein v. Roesch,* supra.

■ We have no difficulty finding a conversion of guardianship property by the defendant, but the record also reveals that there was a conspiracy to convert the money placed in the plaintiff's care for the little boy to the benefit of the plaintiff's daughter and her husband. This was joined in by the defendant, the Meidingers and the plaintiff. The plaintiff's sole excuse is that he agreed to it after the defendant had indicated such action was legal. This advice by the attorney was not only false, but

a violation of all ethical standards for an attorney. Mr. Myers had been disbarred for this and similar transactions coming to the attention of the State Bar.

In our opinion, this does not change the plaintiff's position as a co-conspirator. He was a man of considerable business experience. He had signed a solemn oath to protect the property of his grandson. He could not have thought that the entire guardianship process was carried on in court so that he would be free to divert the guardianship money as he pleased without ever making an accounting to the court. His own testimony indicated some realization of his duties as guardian. He was willing to go along and pay the bills out of this guardianship account if it were "legal." Further, he definitely found out that an accounting was necessary during the first year,[2] and yet he still continued in the conspiracy, only bothering to obtain some security from the Meidingers to protect himself.

In the end, the plaintiff had to restore all the money to the guardianship account, and he is entitled to be indemnified by the defendant for the amount of money necessary to restore the account. Section 89 of the Restatement of the Law of Restitution states:

"A person who is induced by the fraud of another to believe that his conduct is lawful and in reliance upon that belief does an act because of which both are liable in tort, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability if, as between the two, his reliance was justifiable."

In light of the defendant's position of superior knowledge as a result of being an attorney, the plaintiff is entitled to indemnity

from the defendant for the money he was required to restore to the account.

■ The record shows that the plaintiff received a deed from the Meidingers made out to him individually for certain realty. He still had this unrecorded deed at the time of trial. The extent of the plaintiff's actual damages is directly affected by the question of whether the deed he held as an individual was of value, because if it was, the value of that interest should be deducted from the compensatory damages awarded against the defendant. For this reason we reverse the judgment as to the award of compensatory damages and remand to the trial court with instructions to fix the amount of compensatory damages after determining the extent, if any, to which the plaintiff's loss was reduced by virtue of the property he received as an individual through the deed.

■ We turn now to the trial court's award of exemplary damages in the amount of $10,000. The theoretical basis for the award of such damages is to punish the defendant and to set an example for future potential wrongdoers. Although the award of these damages would certainly punish the defendant in this case, we believe such an award would set the wrong kind of example, since we would be rewarding a guardian who conspired to convert guardianship funds. Although we hold that the plaintiff is entitled to indemnity because of the defendant's position of superior knowledge, yet in light of his own conduct as guardian, we do not believe the plaintiff should also receive a $10,000 windfall in addition to being indemnified. This action was brought by the plaintiff in his individual capacity and not in his capacity as guardian. We express no opinion as to whether

2. As guardian, plaintiff made a March 1971 accounting. At that time a guardianship account was established, and plaintiff signed a signature card for the account and signed and swore to the guardianship accounting. Plaintiff used the money he borrowed as an individual to bring the guardianship account up to an amount equal to the sum of money he was required to then account for as guardian. Three months later he took the money from his account as guardian and used it to pay off his personal note. Regardless of whether plaintiff's actions prior to March 1971, could be justified as having been based solely upon his reliance upon the defendant's advice, the same can hardly apply to his conversion of guardianship funds in June 1971, from the guardianship account and use of those funds to pay off his personal bank note.

exemplary damages would have been appropriate in an action brought by the guardianship for conversion of guardianship funds. The award of exemplary damages to the plaintiff in his individual capacity is reversed.

We also reverse the award of attorneys fees in the amount of $1,880. SDCL 15–17–7 provides that attorney fees may be awarded for or against any party to an action only in the cases where the same is specifically provided by statute. While the general rule is that attorney fees will be allowed in indemnity cases, this rule is limited to the defense of the claim indemnified against and does not extend to services rendered in establishing the right of indemnity. 41 Am.Jur.2d, Indemnity, § 36, pp. 726–727; *Jones v. Strom Construction Co., Inc.,* 84 Wash.2d 518, 527 P.2d 1115.

We affirm the trial court's order denying the defendant's motion for an order setting aside and vacating the findings of fact, conclusions of law and judgment in appeal No. 11706. In light of our finding that the defendant properly raised the issue of sufficiency of the evidence to support the judgment despite his failure to submit proposed findings of fact, he was not prejudiced by the court's ruling and no reversible error exists.

We affirm the trial court's finding of liability, but reverse on all three aspects of damages. That portion of the judgment in appeal No. 11665 awarding attorney fees and exemplary damages is reversed. That portion of the judgment awarding compensatory damages, together with interest and properly taxable costs, is reversed and remanded to the trial court with instructions to fix the amount of compensatory damages after determining the extent, if any, to which the plaintiff's loss was reduced by virtue of the property he received as an individual through the deed from the Meidingers.

ZASTROW, PORTER and MORGAN, JJ., concur.

WOLLMAN, J., concurs in part and dissents in part.

WOLLMAN, Justice (concurring in part, dissenting in part).

I agree that the evidence supports the trial court's finding that defendant converted the guardianship funds. I would also uphold the trial court's award of punitive damages.

Defendant contends that there could have been no conversion in the instant case because plaintiff had agreed that the insurance proceeds be disbursed to pay the Meidingers' bills and to increase their equity in the real estate that they were purchasing. Although it is true that there can be no conversion where the property is obtained through the consent of the owner, *Van Dusen & Co. v. Arnold,* 5 S.D. 588, 59 N.W. 961; *Biesmann v. Black Hills United Mining Co.,* 64 S.D. 82, 264 N.W. 518, the evidence supports the trial court's finding that plaintiff's consent to the endorsing of the insurance check and the disbursing of the proceeds was given on the condition that such procedure be legal, and that plaintiff had relied upon defendant's representation that it was legal. Now one might argue, as does defendant, that a person of plaintiff's experience in the business world, and I note here that plaintiff testified that he had been in the farm implement business for some twenty-one years, must have known that an accounting would be required in the guardianship and that some steps would have to be taken to recoup the funds so disbursed. This argument is belied, however, by plaintiff's testimony, some of which is quoted in the majority opinion, that he had relied upon defendant's assurance that the disbursements could be legally made. It will not lie in defendant's mouth to say that plaintiff should have mistrusted defendant and should have dealt justly with his ward, for it was in response to defendant's entreaties that plaintiff endorsed the check so that defendant could proceed to disburse the funds in blatant disregard of the statutory requirements that a fiduciary, and, perforce, his attorney, safeguard and manage the ward's property in the best interests of the ward. See

SDCL 30–29–7 through 30–29–9, which provide:

SDCL 30–29–7:

"A guardian of the property must keep safely the property of his ward. He must not permit any unnecessary waste or destruction of the real property nor make any sale of such property without the order of the circuit court, but must, so far as it is in his power, maintain the same with its buildings and appurtenances out of the income or other property of the estate, and deliver it to the ward at the close of his guardianship in as good condition as he received it."

SDCL 30–29–8:

"Every guardian must dispose of and manage the estate according to law and for the best interests of the ward, and faithfully discharge his trust in relation thereto, and also in relation to the care and custody and education of the ward."

SDCL 30–29–9:

"Every guardian must manage the estate of his ward frugally and without waste, and apply the income and profits thereof, as far as may be necessary, to the comfortable and suitable maintenance and support of the ward and his family, if there be any, and to the education of the ward if a minor."

If there is one theme that pervades SDCL 30–29, it is that a fiduciary has a solemn duty of trust to safeguard the property of his ward, a duty that is so jealously regarded that the law will brook no dealings by a guardian that will in any manner subordinate the ward's best interests to those of the guardian. See, e. g., *Haugen v. Lien,* 56 S.D. 286, 228 N.W. 379; *Schroeder v. Taylor,* 58 S.D. 365, 236 N.W. 365. If the law presumes that a guardian will be cognizant of the responsibilities flowing from his position of trust, how can it be said that an attorney should be held to any lesser standard of awareness and responsibility? This is not to say that an attorney is an insurer of his guardian-client's funds, but that he will be answerable in an action for conversion if he so egregiously miscounsels the guardian into disbursing guardianship funds for the benefit of others that it must be concluded that he did so knowing full well that the disbursement will constitute a clear breach of the guardian's duty to safeguard the ward's property. This we think to have been the situation in the instant case. We deal here with no species of attorney negligence that would relegate the injured client to a malpractice action, but with a case of outright deception. Defendant was no neophyte in the law whose errors of judgment might be explained by inexperience or simple lack of knowledge, but was an experienced attorney with a sophisticated grasp of procedural and substantive law. See, e. g., *Dornbusch v. Dornbusch,* 83 S.D. 524, 162 N.W.2d 283; *Halvorson v. Birkland,* 84 S.D. 328, 171 N.W.2d 77; *Bahr v. Bahr,* 85 S.D. 240, 180 N.W.2d 465. Surely defendant must have known that to counsel plaintiff that it was "legal" to deposit guardianship funds in defendant's personal account and then disburse the money to pay past due bills of the ward's mother and adoptive father at places such as Kirkpatrick's Jewelry and the Goodyear Tire Store was to deprive the guardian of dominion and control over such funds for all time.

Should we be so cynical of a layman's implicit trust in the advice of his lawyer that we can say as a matter of law that plaintiff's testimony was inherently incredible or that no intelligent businessman of any experience would have been justified in relying on the advice given by defendant? True, there no doubt are many situations in which a layman might not be justified in relying upon legal advice that is so patently absurd that it would not warrant belief by anyone of the age of understanding, but the counsel given by defendant in the instant case does not necessarily fall within that classification in the absence of some evidence that plaintiff was otherwise aware of the legal duties imposed upon him as guardian. Once he learned that the funds would have to be accounted for and replaced, plaintiff did what would be expected of

him—he asked defendant to return the money.

If plaintiff's original reliance upon defendant's advice was sufficiently well placed to justify a finding of conversion, then it justified the award of punitive damages. I would so hold, notwithstanding my firm belief that awards of punitive damages should be closely scrutinized and that the purpose of a claim for such an award should not be, as I discern the trend to be, a thinly-veiled attempt to recoup general damages in a breach of contract action.

SDCL 20–10–1 provides:

"One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

SDCL 20–10–2 provides in part:

"A deceit within the meaning of § 20–10–1 is either:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

* * *"

SDCL 21–3–2 provides in part:

"In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, * * * the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant."

I conclude that defendant's conduct can be characterized as constituting deceit, as that term is defined by SDCL 20–10–2(1), supra, which is that species of fraud that will support an award of punitive damages under SDCL 21–3–2. *Rist v. Karlen,* S.D., 241 N.W.2d 717. As stated above, defendant was no neophyte in the law at the time he advised plaintiff that it would be proper, and thus "legal," to use the insurance proceeds in the manner he suggested. The trial court's determination that defendant knowingly misrepresented the legality of the proposed disbursement of the insurance proceeds is the equivalent of a finding that defendant did not believe to be true his representation that such disbursement would be legal. Cf. *Neilson v. Edwards,* 34 S.D. 399, 148 N.W. 844. See generally 18 Am.Jur.2d, Conversion, § 92.

Implicit in what I have said above is my belief that the case should not be returned for additional finding on the matter of the damages suffered by plaintiff. If the deed from Sally and Bill Meidinger was intended as a mortgage, it was a poor second lien in view of the rights of the contract vendor; as an absolute conveyance it was little better than a second mortgage. Plaintiff treated the property conveyed by the deed as of no value. If defendant wanted to establish that plaintiff was either fully or partly secured, he could have introduced evidence of the value of the property conveyed by the deed. Defendant submitted no proposed finding on the issue of the value to plaintiff of land so conveyed. In the absence of such a proposed finding and of any evidence to support such a finding, I would hold that the evidence submitted by plaintiff supports the finding entered by the trial court regarding the amount of compensatory damages due plaintiff.

I agree that SDCL 21–3–3(3) does not authorize an award of attorneys' fees in this type of action. The California courts have so interpreted California Civil Code § 3336, which contains provisions identical in language to SDCL 21–3–3(3). See *Viner v. Untrecht,* 26 Cal.2d 261, 158 P.2d 3; *Russell v. United Pacific Ins. Co.,* 214 Cal. App.2d 78, 29 Cal.Rptr. 346.