# FIELD ET AL. *v.* MANS

No. 94–967.   Argued October 2, 1995—Decided November 28, 1995

60

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, THOMAS, and GINSBURG, JJ., joined. GINSBURG, J., filed a concurring opinion, *post*, p. 78. BREYER, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 79.

*Christopher J. Seufert* argued the cause for petitioners. With him on the brief was *William J. Schultz.*

*Alan Jenkins* argued the cause for the United States as *amicus curiae.* With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, William Kanter,* and *Bruce G. Forrest.*

*W. E. Whittington IV,* by appointment of the Court, 515 U. S. 1156, argued the cause for respondent. With him on the brief was *Geoffrey J. Vitt.**

JUSTICE SOUTER delivered the opinion of the Court.

The Bankruptcy Code's provisions for discharge stop short of certain debts resulting from "false pretenses, a false representation, or actual fraud." 11 U. S. C. §523(a)(2)(A). In this case we consider the level of a creditor's reliance on a fraudulent misrepresentation necessary to place a debt thus beyond release. While the Court of Appeals followed a rule requiring reasonable reliance on the statement, we hold the standard to be the less demanding one of justifiable reliance and accordingly vacate and remand.

I

In June 1987, petitioners William and Norinne Field sold real estate for $462,500 to a corporation controlled by respondent Philip W. Mans, who supplied $275,000 toward the purchase price and personally guaranteed a promissory note for $187,500 secured by a second mortgage on the property. The mortgage deed had a clause calling for the Fields' con-

---

*\*Gary Klein* filed a brief for the National Association of Consumer Bankruptcy Attorneys for the United States as *amicus curiae* urging affirmance.

sent to any conveyance of the encumbered real estate during the term of the secured indebtedness, failing which the entire unpaid balance on the note would become payable upon a sale unauthorized.

On October 8, 1987, Mans's corporation triggered application of the clause by conveying the property to a newly formed partnership without the Fields' knowledge or consent. The next day, Mans wrote to the Fields asking them not for consent to the conveyance but for a waiver of their rights under the due-on-sale clause, saying that he sought to avoid any claim that the clause might apply to arrangements to add a new principal to his land development organization. The letter failed to mention that Mans had already caused the property to be conveyed. The Fields responded with an offer to waive if Mans paid them $10,500. Mans answered with a lower bid, to pay only $500, and again failed to disclose the conveyance. There were no further written communications.

The ensuing years brought a precipitous drop in real estate prices, and on December 10, 1990, Mans petitioned the United States Bankruptcy Court for the District of New Hampshire for relief under Chapter 11 of the Bankruptcy Code. On the following February 6, the Fields learned of the October 1987 conveyance, which their lawyer had discovered at the registry of deeds. In their subsequent complaint in the bankruptcy proceeding, they argued that some $150,000 had become due upon the 1987 conveyance for which Mans had become liable as guarantor, and that his obligation should be excepted from discharge under § 523(a)(2)(A) of the Bankruptcy Code, 11 U. S. C. § 523(a)(2)(A), as a debt resulting from fraud.[1]

The Bankruptcy Court found that Mans's letters constituted false representations on which petitioners had relied

---

[1] Although we observe the distinction between Mans and his corporations, the record before us does not indicate that the parties thought anything should turn on treating them separately. As the case comes to us, Mans is presented as the originator of both debt and misrepresentation.

to their detriment in extending credit.[2]   The court followed
Circuit precedent, however, see *In re Burgess*, 955 F. 2d 134
(CA1 1992), in requiring the Fields to make a further show-
ing of reasonable reliance, defined as "what would be reason-
able for a prudent man to do under those circumstances."
App. 43–44.   The court held that a reasonable person would
have checked for any conveyance after the exchange of
letters, and that the Fields had unreasonably ignored
further reason to investigate in 1988, when Mr. Field's boss
told him of a third party claiming to be the owner of the
property.[3]   Having found the Fields unreasonable in relying
without further enquiry on Mans's implicit misrepresenta-
tion about the state of the title, the court held Mans's debt
dischargeable.

The District Court affirmed, likewise following Circuit
precedent in holding that § 523(a)(2)(A) requires reasonable
reliance to exempt a debt from discharge, and finding the
Bankruptcy Court's judgment supported by adequate indica-
tion in the record that the Fields had relied without sufficient
reason.   The Court of Appeals for the First Circuit affirmed
judgment for the Bankruptcy Court's reasons.   Judgt. order
reported at 36 F. 3d 1089 (1994).

We granted certiorari, 514 U. S. 1095 (1995), to resolve a
conflict among the Circuits over the level of reliance that
§ 523(a)(2)(A) requires a creditor to demonstrate.[4]

---

[2] Here, Mans argues that neither he nor his corporation obtained any
extension of credit at the time of the alleged fraud or thereafter.   Since
this issue was never raised previously and is not fairly subsumed within
the question on which we granted certiorari, we do not reach it.

[3] Mr. Field testified in the Bankruptcy Court proceeding that he asked
Mans in 1988 about the report of a conveyance and that Mans indicated he
had not conveyed the property, App. 14–15, but Mr. Field later testified
that he had not confronted Mans on the issue, *id.*, at 26–27.   The Bank-
ruptcy Court made no finding about any such conversation.

[4] Compare *In re Ophaug*, 827 F. 2d 340 (CA8 1987); *In re Mayer*, 51
F. 3d 670 (CA7 1995); *In re Allison*, 960 F. 2d 481 (CA5 1992), with
*In re Burgess*, 955 F. 2d 134 (CA1 1992); *In re Mullet*, 817 F. 2d 677 (CA10
1987).

## II

The provisions for discharge of a bankrupt's debts, 11 U. S. C. §§ 727, 1141, 1228, and 1328(b), are subject to exception under 11 U. S. C. § 523(a), which carries 16 subsections setting out categories of nondischargeable debts. Two of these are debts traceable to falsity or fraud or to a materially false financial statement, as set out in § 523(a)(2):

"(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.        .        .        .        .

"(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

"(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

"(B) use of a statement in writing—

"(i) that is materially false;

"(ii) respecting the debtor's or an insider's financial condition;

"(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

"(iv) that the debtor caused to be made or published with intent to deceive."

These provisions were not innovations in their most recent codification, the Bankruptcy Reform Act of 1978 (Act), Pub. L. 95–598, 92 Stat. 2590, but had obvious antecedents in the Bankruptcy Act of 1898 (1898 Act), as amended, 30 Stat. 544. The precursor to § 523(a)(2)(A) was created when § 17(a)(2) of the 1898 Act was modified by an amendment in 1903, which provided that debts that were "liabilities for obtaining property by false pretenses or false representations" would not be affected by any discharge granted to a bankrupt, who

would still be required to pay them. Act of Feb. 5, 1903, ch. 487, 32 Stat. 798. This language inserted in § 17(a)(2) was changed only slightly between 1903 and 1978,[5] at which time the section was recodified as § 523(a)(2)(A) and amended to read as quoted above. Thus, since 1903 the statutory language at issue here merely progressed from "false pretenses or false representations" to "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

Section 523(a)(2)(B), however, is the product of more active evolution. The germ of its presently relevant language was also inserted into the 1898 Act by a 1903 amendment, which barred any discharge by a bankrupt who obtained property by use of a materially false statement in writing made for the purpose of obtaining the credit. Act of Feb. 5, 1903, ch. 487, 32 Stat. 797–798. The provision did not explicitly require an intent to deceive or set any level of reliance, but Congress modified its language in 1960 by adding the requirements that the debtor intend to deceive the creditor and that the creditor rely on the false statement, and by limiting its application to false financial statements. Act of July 12, 1960, Pub. L. 86–621, 74 Stat. 409.[6] In 1978, Con-

---

[5] The one intervening change to the quoted language was that "obtaining property" became "obtaining money or property." Act of June 22, 1938, 52 Stat. 851.

[6] The 1960 amendments also transferred the language on false financial statements by individuals from § 14 (where it barred any discharge) to § 17(a)(2) (where it barred discharge of only the specific debt incurred as a result of the false financial statement). Thus, as of 1960 the relevant portion of § 17(a)(2) provided that discharge would not release a bankrupt from debts that

"are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting [the bankrupt's] financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive." Act of July 12, 1960, Pub. L. 86–621, 74 Stat. 409.

gress rewrote the provision as set out above and recodified it as § 523(a)(2)(B). Though the forms of the 1960 and 1978 provisions are quite different, the only distinction relevant here is that the 1978 version added a new element of reasonable reliance.

The sum of all this history is two close statutory companions barring discharge. One applies expressly when the debt follows a transfer of value or extension of credit induced by falsity or fraud (not going to financial condition), the other when the debt follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied.

### III

The question here is what, if any, level of justification a creditor needs to show above mere reliance in fact in order to exempt the debt from discharge under § 523(a)(2)(A). The text that we have just reviewed does not say in so many words. While § 523(a)(2)(A) speaks of debt for value "obtained by . . . false pretenses, a false representation, or actual fraud," it does not define those terms or so much as mention the creditor's reliance as such, let alone the level of reliance required. No one, of course, doubts that some degree of reliance is required to satisfy the element of causation inherent in the phrase "obtained by," but the Government, as *amicus curiae* (like petitioners in a portion of their brief), submits that the minimum level will do. It argues that when § 523(a)(2)(A) is understood in its statutory context, it requires mere reliance in fact, not reliance that is reasonable under the circumstances. Both petitioners and the Government note that § 523(a)(2)(B) expressly requires reasonable reliance, while § 523(a)(2)(A) does not. They emphasize that the precursors to §§ 523(a)(2)(A) and (B) lacked any reasonableness requirement, and that Congress added an element of reasonable reliance to § 523(a)(2)(B) in 1978, but not to § 523(a)(2)(A). They contend that the addition to § 523(a)

(2)(B) alone supports an inference that, in § 523(a)(2)(A), Congress did not intend to require reasonable reliance, over and above actual reliance. But this argument is unsound.

The argument relies on the apparent negative pregnant, under the rule of construction that an express statutory requirement here, contrasted with statutory silence there, shows an intent to confine the requirement to the specified instance. See *Gozlon-Peretz* v. *United States*, 498 U. S. 395, 404 (1991) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'") (quoting *Russello* v. *United States*, 464 U. S. 16, 23 (1983)). Thus the failure of § 523(a)(2)(A) to require the reasonableness of reliance demanded by § 523(a)(2)(B) shows that (A) lacks such a requirement. Without more, the inference might be a helpful one. But there is more here, showing why the negative pregnant argument should not be elevated to the level of interpretive trump card.

First, assuming the argument to be sound, the most it would prove is that the reasonableness standard was not intended. But our job does not end with rejecting reasonableness as the standard. We have to discover the correct standard, and where there are multiple contenders remaining (as there are here), the inference from the negative pregnant does not finish the job.

There is, however, a more fundamental objection to depending on a negative pregnant argument here, for in the present circumstances there is reason to reject its soundness even as far as it goes. Quite simply, if it proves anything here, it proves too much. If the negative pregnant is the reason that § 523(a)(2)(A) has no reasonableness requirement, then the same reasoning will strip paragraph (A) of any requirement to establish a causal connection between the misrepresentation and the transfer of value or extension of credit, and it will eliminate scienter from the very notion

of fraud. Section 523(a)(2)(B) expressly requires not only reasonable reliance but also reliance itself; and not only a representation but also one that is material; and not only one that is material but also one that is meant to deceive. Section 523(a)(2)(A) speaks in the language neither of reliance nor of materiality nor of intentionality. If the contrast is enough to preclude a reasonableness requirement, it will do as well to show that the debtor need not have misrepresented intentionally, the statement need not have been material, and the creditor need not have relied. But common sense would balk.[7] If Congress really had wished to bar discharge to a debtor who made unintentional and wholly immaterial misrepresentations having no effect on a creditor's decision, it could have provided that. It would, however, take a very clear provision to convince anyone of anything so odd, and nothing so odd has ever been apparent to the courts that have previously construed this statute, routinely requiring intent, reliance, and materiality before applying § 523(a)(2)(A). See, *e. g., In re Phillips,* 804 F. 2d 930 (CA6 1986); *In re Martin,* 963 F. 2d 809 (CA5 1992); *In re Menna,* 16 F. 3d 7 (CA1 1994).

The attempt to draw an inference from the inclusion of reasonable reliance in § 523(a)(2)(B), moreover, ignores the significance of a historically persistent textual difference be-

---

[7] The fact that § 523(a)(2) uses the term "obtained by" does not avoid this problem, for two reasons. First, "obtained by" applies to both §§ 523(a)(2)(A) and (B); if it supplies the elements of materiality, intent to deceive, and actual reliance it renders § 523(a)(2)(B)'s inclusion of materiality and intent to deceive redundant. More to the point, it renders Congress's addition of the requirements of actual reliance and intent to deceive to the precursor of § 523(a)(2)(B) (§ 17(a)(2) of the 1898 Act) in 1960 nonsensical, since that provision also had the "obtained by" language. Second, it seems impossible to construe "obtained by" as encompassing a requirement of intent to deceive; one can obtain credit by a misrepresentation even if one has no intention of doing so (for example, by unintentionally writing that one has an annual income of $100,000, rather than $10,000, in applying for a loan).

tween the substantive terms in §§ 523(a)(2)(A) and (B): the former refer to common-law torts, and the latter do not. The principal phrase in the predecessor of § 523(a)(2)(B) was "obtained property . . . upon a materially false statement in writing," Act of Feb. 5, 1903, ch. 487, 32 Stat. 797; in the current § 523(a)(2)(B) it is value "obtained by . . . use of a statement in writing." Neither phrase is apparently traceable to another context where it might have been construed to include elements that need not be set out separately. If other elements are to be added to "statement in writing," the statutory language must add them (and of course it would need to add them to keep this exception to dischargeability from swallowing most of the rule). The operative terms in § 523(a)(2)(A), on the other hand, "false pretenses, a false representation, or actual fraud," carry the acquired meaning of terms of art. They are common-law terms, and, as we will shortly see in the case of "actual fraud," which concerns us here, they imply elements that the common law has defined them to include. See *Durland* v. *United States*, 161 U. S. 306, 312 (1896); *James-Dickinson Farm Mortgage Co.* v. *Harry*, 273 U. S. 119, 121 (1927). Congress could have enumerated their elements, but Congress's contrary drafting choice did not deprive them of a significance richer than the bare statement of their terms.

## IV

"It is . . . well established that '[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" *Community for Creative Non-Violence* v. *Reid*, 490 U. S. 730, 739 (1989) (quoting *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 329 (1981)); see also *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U. S. 318, 322 (1992). In this case, neither the structure of § 523(a)(2) nor any explicit statement in § 523(a)(2)(A) reveals, let alone dictates, the

particular level of reliance required by § 523(a)(2)(A), and there is no reason to doubt Congress's intent to adopt a common-law understanding of the terms it used.

Since the District Court treated Mans's conduct as amounting to fraud, we will look to the concept of "actual fraud" as it was understood in 1978 when that language was added to § 523(a)(2)(A).[8]  Then, as now, the most widely accepted distillation of the common law of torts[9] was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act.  The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required.  *Id.*, § 537.  The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation."  *Id.*, § 540.  Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage.  *Id.*, § 540, Illustration 1.  The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort.  Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not

---

[8] Although we do not mean to suggest that the requisite level of reliance would differ if there should be a case of false pretense or representation but not of fraud, there is no need to settle that here.

[9] We construe the terms in § 523(a)(2)(A) to incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State.  See *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U. S. 318, 323, n. 3 (1992); *Community for Creative Non-Violence* v. *Reid*, 490 U. S. 730, 740 (1989).

mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.*, § 545A, Comment *b*. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is

> "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses." *Id.*, § 541, Comment *a*.

A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

Similarly, the edition of Prosser's Law of Torts available in 1978 (as well as its current successor) states that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." W. Prosser, Law of

Torts § 108, p. 718 (4th ed. 1971) (footnotes omitted); accord, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108, p. 752 (5th ed. 1984) (Prosser & Keeton). Prosser represents common-law authority as rejecting the reasonable person standard here, stating that "the matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." Prosser, *supra*, § 108, at 717; accord, Prosser & Keeton § 108, at 751; see also 1 F. Harper & F. James, Law of Torts § 7.12, pp. 581–583 (1956) (rejecting reasonableness standard in misrepresentation cases in favor of justifiability and stating that "by the distinct tendency of modern cases, the plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiff's failure to make the investigation or examination to verify the same") (footnote omitted); accord, 2 F. Harper, F. James, & O. Gray, Law of Torts § 7.12, pp. 455–458 (2d ed. 1986).

These authoritative syntheses surely spoke (and speak today) for the prevailing view of the American common-law courts. Of the 46 States that, as of November 6, 1978 (the day the Act became law), had articulated the required level of reliance in a common-law fraud action, 5 required reasonable reliance,[10] 5 required mere re-

---

[10] See *Polansky* v. *Orlove*, 252 Md. 619, 624–625, 251 A. 2d 201, 204 (1969) (stating that purchaser must show reasonable reliance); *Cudemo* v. *Al and Lou Construction Co.*, 54 App. Div. 2d 995, 996, 387 N. Y. S. 2d 929, 930 (1976) (referring to justifiable reliance but imposing duty to investigate); *Works* v. *Wyche*, 344 S. W. 2d 193, 198 (Tex. Civ. App. 1961) (requiring reasonable reliance); *Jardine* v. *Brunswick Corp.*, 18 Utah 2d 378, 382, 423 P. 2d 659, 662 (1967) (requiring reasonable reliance); *Horner* v. *Ahern*, 207 Va. 860, 863–864, 153 S. E. 2d 216, 219 (1967) (stating that, if purchaser

liance in fact,[11] and 36 required an intermediate level of reliance, most frequently referred to as justifiable reliance.[12] Following our established practice of finding Con-

is given information that would excite suspicions of reasonably prudent man, he has a duty to investigate).

[11] See *Beavers* v. *Lamplighters Realty, Inc.*, 556 P. 2d 1328, 1331 (Okla. App. 1976) (requiring actual reliance only); *Campanelli* v. *Vescera*, 75 R. I. 71, 74–75, 63 A. 2d 722, 724 (1949) (stating that actual reliance is sufficient, notwithstanding relying party's failure to investigate or verify); *Negyessy* v. *Strong*, 136 Vt. 193, 194–195, 388 A. 2d 383, 385 (1978) (stating that actual reliance is sufficient, even if plaintiff might have discovered the wrong but for his own neglect); *Horton* v. *Tyree*, 104 W. Va. 238, 242, 139 S. E. 737, 738 (1927) (holding that one to whom a representation is made has the right to rely without any further inquiry); *Johnson* v. *Soulis*, 542 P. 2d 867, 872 (Wyo. 1975) (requiring actual reliance only).

[12] See *Franklin* v. *Nunnelley*, 242 Ala. 87, 89, 5 So. 2d 99, 101 (1941) (stating that there is no duty to investigate in absence of anything that would arouse suspicion); *Thomson* v. *Wheeler Construction Co.*, 385 P. 2d 111, 113 (Alaska 1963) (stating that justifiable reliance is the appropriate standard); *Barnes* v. *Lopez*, 25 Ariz. App. 477, 480, 544 P. 2d 694, 697 (1976) (holding that purchaser had no duty to investigate); *Fausett & Co.* v. *Bullard*, 217 Ark. 176, 179–180, 229 S. W. 2d 490, 491–492 (1950) (relying on Restatement of Torts §540 (1938) (hereinafter Restatement (First)), which applies the same rule as in Restatement (Second) of Torts §540 (1976)); *Seeger* v. *Odell*, 18 Cal. 2d 409, 414–415, 115 P. 2d 977, 980–981 (1941) (relying on Restatement (First) and W. Prosser, Law of Torts (1941)); *Monte Verde* v. *Moore*, 539 P. 2d 1362, 1365 (Colo. App. 1975) (requiring justifiable reliance and distinguishing it from reasonable reliance); *Ford* v. *H. W. Dubiskie & Co.*, 105 Conn. 572, 577–578, 136 A. 560, 562–563 (1927) (stating that no investigation is necessary for reliance to be justified); *Eastern States Petroleum Co.* v. *Universal Oil Products Co.*, 24 Del. Ch. 11, 28–29, 3 A. 2d 768, 776–777 (1939) (holding that buyer had right to rely without investigating); *Board of Public Instruction* v. *Everett W. Martin & Son, Inc.*, 97 So. 2d 21, 26–27 (Fla. 1957) (holding that purchaser had no duty to investigate where seller made clear factual representation); *City Dodge, Inc.* v. *Gardner*, 232 Ga. 766, 770, 208 S. E. 2d 794, 797 (1974) (requiring justifiable reliance); *Sorenson* v. *Adams*, 98 Idaho 708, 715, 571 P. 2d 769, 776 (1977) (stating that neither purchasers' lack of caution in believing a factual misrepresentation nor their failure to make an independent investigation is a defense to their fraud action); *Roda* v. *Berko*, 401 Ill. 335, 342, 81 N. E. 2d 912, 916 (1948) ("[I]f it appears that one party

74

gress's meaning in the generally shared common law when common-law terms are used without further specification, we hold that § 523(a)(2)(A) requires justifiable, but not reason-

has been guilty of an intentional and deliberate fraud, the doctrine is well settled that he cannot defend against such fraud by saying that the same might have been discovered had the party whom he deceived exercised reasonable diligence and care"); *Gonderman* v. *State Exchange Bank*, 166 Ind. App. 181, 190, 334 N. E. 2d 724, 729 (1975) (stating that level of required prudence depends on whether the recipient of a representation is unwary); *Sutton* v. *Greiner*, 177 Iowa 532, 540–541, 159 N. W. 268, 271–272 (1916) (same as Illinois); *Prather* v. *Colorado Oil & Gas Corp.*, 218 Kan. 111, 119, 542 P. 2d 297, 304 (1975) (finding no duty to investigate); *Sanford Construction Co.* v. *S. & H. Contractors, Inc.*, 443 S. W. 2d 227, 233–234 (Ky. App. 1969) (indicating that level of reliance depends on sophistication of parties); *Horner* v. *Flynn*, 334 A. 2d 194, 205 (Me. 1975) (stating that a person who commits intentional misrepresentation cannot excuse himself based on the foolishness of the hearer in believing the representation); *Yorke* v. *Taylor*, 332 Mass. 368, 372–374, 124 N. E. 2d 912, 915–916 (1955) (relying on Restatement (First)); *Boss* v. *Tomaras*, 241 Mich. 540, 542, 217 N. W. 783 (1928) (finding right to rely without investigation); *Murphy* v. *Country House, Inc.*, 307 Minn. 344, 351, 240 N. W. 2d 507, 512 (1976) (rejecting reasonable person standard and applying subjective test based on intelligence and experience of aggrieved person); *First Mobile Home Corp.* v. *Little*, 298 So. 2d 676, 679 (Miss. 1974) (requiring justifiable reliance); *Tietjens* v. *General Motors Corp.*, 418 S. W. 2d 75, 81–83 (Mo. 1967) (stating that reliance required depends on the positions of the parties, and that there is no duty to investigate); *Bails* v. *Gar*, 171 Mont. 342, 348–349, 558 P. 2d 458, 462–463 (1976) (stating that requirement depends on experience and resourcefulness of relying party); *Growney* v. *C M H Real Estate Co.*, 195 Neb. 398, 400–401, 238 N. W. 2d 240, 242 (1976) (requiring justifiable reliance); *Sanguinetti* v. *Strecker*, 94 Nev. 200, 206, 577 P. 2d 404, 408 (1978) (requiring justifiable reliance); *Smith* v. *Pope*, 103 N. H. 555, 559–560, 176 A. 2d 321, 324–325 (1961) (relying on Restatement (First)); *National Premium Budget Plan Corp.* v. *National Fire Insurance Co. of Hartford*, 97 N. J. Super. 149, 209–211, 234 A. 2d 683, 716–718 (1967) (relying on Restatement (First) and W. Prosser, Law of Torts (2d ed. 1955), including example of one-eyed horse, in finding that justifiable reliance is appropriate standard), aff'd, 106 N. J. Super. 238, 254 A. 2d 819 (1969); *Jones* v. *Friedman*, 57 N. M. 361, 367–368, 258 P. 2d 1131, 1134–1135 (1953) (requiring justifiable reliance and no general duty to investigate); *Johnson*

able, reliance.  See *In re Vann,* 67 F. 3d 277 (CA11 1995); *In re Kirsh,* 973 F. 2d 1454 (CA9 1992).

It should go without saying that our analysis does not relegate all reasoning from a negative pregnant to the rubbish heap, or render the reasonableness of reliance wholly irrelevant under § 523(a)(2)(A).  As for the rule of construction, of course it is not illegitimate, but merely limited.  The more apparently deliberate the contrast, the stronger the inference, as applied, for example, to contrasting statutory sections originally enacted simultaneously in relevant respects, see *Gozlon-Peretz* v. *United States,* 498 U. S., at 404 (noting that a single enactment created provisions with language that differed).  Even then, of course, it may go no further than ruling out one of several possible readings as the wrong one.  The rule is weakest when it suggests results strangely at odds with other textual pointers, like the common-law lan-

---

v. *Owens,* 263 N. C. 754, 758–759, 140 S. E. 2d 311, 314 (1965) (referring to reasonable reliance, but applying standard as preventing seller from saying that buyer ought not to have been so gullible as to trust him, unless the circumstances are such that buyer appears to have known the truth); *Steiner* v. *Roberts,* 72 Ohio L. Abs. 391, 396, 131 N. E. 2d 238, 242 (App. 1955) (applying standard from Restatement (First)); *Furtado* v. *Gemmell,* 242 Ore. 177, 182, 408 P. 2d 733, 735 (1965) (holding that a representee has some duty, although less than a duty to exercise reasonable care, to protect his interest); *Emery* v. *Third National Bank of Pittsburgh,* 314 Pa. 544, 547–548, 171 A. 881, 882 (1934) (stating that a representee must be " 'justified in relying' " on the misrepresentation); *Parks* v. *Morris Homes Corp.,* 245 S. C. 461, 466–467, 141 S. E. 2d 129, 132 (1965) (referring to reasonable prudence and diligence, but defining it as depending on intelligence, age, experience, mental and physical condition of the parties, their respective knowledge, and their means of knowledge); *Scherf* v. *Myers,* 258 N. W. 2d 831, 835 (S. D. 1977) (stating that justifiable reliance applies in analogous situation of indemnity based on fraud); *Chiles* v. *Kail,* 34 Wash. 2d 600, 606, 208 P. 2d 1198, 1201–1202 (1949) (stating that test is not what a reasonable and prudent man would have done but whether plaintiff, in the condition he was in, had a right to rely); *First National Bank in Oshkosh* v. *Scieszinski,* 25 Wis. 2d 569, 575–576, 131 N. W. 2d 308, 312 (1964) (requiring justifiable reliance with no general duty to investigate).

guage at work in the statute here. See *Alaska Airlines, Inc.* v. *Brock,* 480 U. S. 678, 690–691 (1987).

As for the reasonableness of reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact. Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naive. The subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance.

## V

There remains a fair question that ought to be faced. It makes sense to protect a creditor even if he was not quite reasonable in relying on a fraudulent representation; fraudulence weakens the debtor's claim to consideration. And yet, why should the rule be different when fraud is carried to the point of a written financial statement? Does it not count against our reading of the statute that a debtor who makes a misrepresentation with the formality of a written financial statement may have less to bear than the debtor who commits his fraud by a statement, perhaps oral, about something other than his bank balance? One could answer that the question does have its force, but counter it by returning to the statutory history and asking why Congress failed to place a requirement of reasonable reliance in § 523(a)(2)(A) if it meant all debtors to be in the same boat. But there may be a better answer, tied to the peculiar potential of financial statements to be misused not just by debtors, but by creditors who know their bankruptcy law. The House Report on the Act suggests that Congress wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers

for the very purpose of insulating their own claims from discharge.[13]  The answer softens the ostensible anomaly.

## VI

In this case, the Bankruptcy Court applied a reasonable person test entailing a duty to investigate.  The court stated that

> "the case law establishes an objective test, and that is what would be reasonable for a prudent man to do under those circumstances.  At a minimum, a prudent man, I think, would have asked his attorney, could he transfer it without my consent?  And the answer would have to be yes, and then the next question would be, well, let's see if he's done it?  And those questions simply were not asked, and I don't think on balance that was reasonable reliance."  App. 43–44.

Because the Bankruptcy Court's requirement of reasonableness clearly exceeds the demand of justifiable reliance that we hold to apply under § 523(a)(2)(A), we vacate the judgment and remand the case for proceedings consistent with this opinion.[14]

*It is so ordered.*

---

[13] "It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding.  While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge.  The forms that the applicant fills out often have too little space for a complete list of debts.  Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts.  Then, at the bottom of the form, the phrase 'I have no other debts' is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting."  H. R. Rep. No. 95–595, pp. 130–131 (1977) (footnote omitted).

[14] JUSTICE BREYER would not remand, for essentially two reasons: in substance the Bankruptcy Court applied the right standard, looking to the individual capacity of Mr. Field in testing whether the Fields relied at all; and the Fields do not deserve a remand, having failed to get their own

JUSTICE GINSBURG, concurring.

I concur in the Court's opinion and write separately to highlight a causation issue still open for determination on remand: Was the debt in question, as the statute expressly requires, "obtained by" the alleged fraud? See 11 U. S. C. § 523(a)(2)(A); *ante,* at 63, n. 3. Mans ultimately urges that the promissory note to the Fields is, in any event, a dischargeable debt because it was not "obtained by" the allegedly fraudulent letters Mans's attorney wrote to the Fields' attorney months *after* the debt was incurred. The Fields maintain that they relied on the letters to their detriment, in effect according Mans an extension of credit instead of invoking the due-on-sale clause.

Mans prevailed on the reliance issue before the bankruptcy, district, and appellate courts on the basis of then-governing Circuit precedent. See *In re Burgess,* 955 F. 2d 134, 140 (CA1 1992) (creditor required to prove that its reliance was reasonable). With the Circuit law on reliance solidly in his favor, Mans understandably did not advance in the lower courts the argument that the debt was not "obtained by" fraud. When the "reliance must be reasonable" rule solid in the Circuit was challenged in this Court, however, Mans raised the causation point as an alternate justification for the judgment in his favor. See Brief for Respondent 32–33 (argument heading V. reads: "Since the credit here was not 'obtained by' the alleged fraud, petitioners have failed to meet the [causation] requirement of 523(a)(2)(A)"); Tr. of Oral Arg. 43 ("[U]nder the clear language of the statute, there

terminology right below and having no real prospect of anything but needless expense even if there is a remand. The first reason takes a bit of kind reading, since the Bankruptcy Judge spoke in terms of an objective standard and expressly found that the Fields had in fact relied, however imprudently. The second may indicate that we would have been justified in denying certiorari, but after taking the case and declaring the correct standard in response to the Fields' argument in this Court, we think they are entitled to decide how Pyrrhic a victory to declare.

has to be an extension of credit in connection with the fraud. It has to be obtained by the fraud . . . .").*

At oral argument, the following exchange between the Court and the Fields' attorney occurred:

> "QUESTION: . . . Suppose the debtor here had simply transferred th[e] property without saying one word to the creditor. . . . [W]ould [the debt] then be dischargeable? There would be no representation at all, just in violation of the agreement the debtor sells the property . . . . Dischargeable, right?
>
> "MR. SEUFERT: While [those are] not the facts of this case, I would agree with you, it would be dischargeable." *Id.*, at 8–9.

It bears consideration whether a debt that would have been dischargeable had the debtor simply transferred the property, in violation of the due-on-sale clause with never a word to the creditor, nonetheless should survive bankruptcy because the debtor wrote to the creditor of the prospect, albeit not the actuality, of the transfer. Because this Court is not positioned to provide a first view on questions of this order, I express no opinion on the appropriate resolution of the unsettled causation ("obtained by") issue.

JUSTICE BREYER, with whom JUSTICE SCALIA joins, dissenting.

I agree with the Court's holding that "actual fraud" under 11 U. S. C. § 523(a)(2)(A) incorporates the common-law elements of intentional misrepresentation. I also agree that to recover under a common-law fraud theory, plaintiffs must do more than show that they *actually* relied upon the defendant's misrepresentation—they must show that the reliance was "justifiable" in the circumstances, but they need not go so far as to show that a "reasonably prudent" person would

---

*Mans appeared *pro se* in the lower courts; he was represented by counsel in this Court.

have relied upon it similarly. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108, pp. 749–753 (5th ed. 1984) (hereinafter Prosser & Keeton). And, I agree that the Bankruptcy Court used the wrong words when it described the "reliance" standard as "an objective test" that asks "what would be reasonable for a prudent man to do under [the] circumstances." App. 43–44. I disagree, however, with the Court's result in this case.

First, the Bankruptcy Court, while using the wrong words, did the right thing. That court essentially found that in mid-1987, Mr. Field and his wife sold their inn for about $500,000 to Mr. Mans, a developer. To secure the $187,000 that Mans still owed them, the Fields kept a mortgage, which had a term that accelerated the debt should Mans transfer the property to anyone else without their permission. A few months later, Mans wrote to the Fields saying that he wanted to transfer the inn to a development partnership which Mans had formed with a new partner, Mr. De Felice. Mans observed that because the Fields had transferred the inn to a corporation, the stock of which was wholly owned by Mans, Mans could effectively accomplish the transfer to the new partnership by simply conveying the stock of the holding company to the partnership, thereby avoiding the "debt acceleration" clause. But, Mans said, he would prefer to transfer the inn outright, and therefore was seeking their permission to do so without accelerating the debt. The Fields did not give permission. Mans transferred the inn anyway. Nothing more was heard of the matter until 1991, when real estate values fell, Mans went bankrupt, and the Fields brought this lawsuit in an effort to prevent the $150,000 they were then owed from disappearing in the bankruptcy.

The Bankruptcy Judge found that Mans' mid-1987 letters implied that he had not *yet* transferred the inn to the partnership as of the time he wrote the letters. But this impli-

cation was false, for Mans had transferred the inn at least a few days earlier. Still, the Bankruptcy Court asked whether that false implication had made any difference, *i. e.*, whether the Fields, during the next few years, had relied upon this false implication in not accelerating the debt (and obtaining their money before Mans' bankruptcy). The judge very much doubted any *actual* reliance. But, in any event, Mr. Field had visited the property fairly regularly to check on the progress of the development, he had seen Mans there fairly often, and he had been told that De Felice had been on the premises, claiming to be "the new owner." And, that being so, the judge held that at some point over the course of the next 3½ years—during which time Mr. Field was "accepting mortgage payments and looking at drawings and discussing the project with Mans"—Mr. Field *should simply have asked* Mans, "What's the deal here? Who owns this thing?" *Id.*, at 42–43. (Or, the Fields could "have simply checked the title in the . . . County Registry of Deeds which Mr. Field has demonstrated he knows very well is up in North Haverhill." *Id.*, at 42.)

To hold this *is*, in my view, to apply the commentators' "justifiable reliance" standard. The court focused upon the individual circumstances and capacity of the plaintiff, Mr. Field. See Prosser & Keeton § 108, at 751. The court found that Mr. Field should have looked into the matter, not because of any general "duty to investigate," but because, in the particular circumstances, he "discovered something which should serve as a warning that he [was] being deceived." *Id.*, § 108, at 752. That is, the court did not use the "objective" test as an improper search for "contributory negligence"—*i. e.*, to deny recovery to one also at fault for failing to exercise "the care of a reasonably prudent person for his own protection." *Id.*, § 108, at 750. Rather, the court viewed the failure to investigate, in light of the clear warnings of deception, as a means of testing whether there was "some objective corroboration to plaintiff's claim that

he did rely," a primary purpose of the "justifiable reliance" requirement. See *id.*, § 108, at 750–751.

Second, the Bankruptcy Court's use of what turned out to be the wrong words ("reasonable" and "prudent man" rather than "justifiable") is not grounds for reversal, for no one brought the "correct" terminology to the lower courts' attention. The Fields did not argue in the Bankruptcy Court, or in their briefs to the District Court or the Court of Appeals, or in their petition for certiorari, that there was any difference between "reasonable reliance" and "justifiable reliance." To the contrary, the Fields took the view (which the Court now unanimously rejects) that *actual* reliance alone— whether or not it meets *any* objective standard—is sufficient for recovery. Indeed, it appears that the Fields did not even mention the word "justifiable" below, but, rather, used the term "reasonable" throughout to refer to any kind of objective standard. The first time the word "justifiable" appears in this case seems to be in the Fields' brief on the merits in this Court where they point to the Restatement's use of the term "justifiable," Restatement (Second) of Torts § 540 (1976), and argue that "[j]ustifiable reliance does *not* require that the recipient of misrepresentation investigate the underlying assertion." Brief for Petitioners 20 (emphasis in original). But see Prosser & Keeton § 108, at 752.

Third, the "correct" terminology would not have appeared obvious to a judge, certainly not to a judge who was not a special expert in the common law of misrepresentation. Prior case law was not neat in its use of the terminology. The commentaries do not refer to the old prudent person standard as a "reasonable reliance" standard, but, instead, distinguish between the "justifiable reliance" standard as it has been understood in cases now disapproved, and the "justifiable reliance" standard as it is applied in most modern cases. See *id.*, § 108; 2 F. Harper, F. James, & O. Gray, Law of Torts § 7.12, pp. 455–464 (2d ed. 1986). Indeed, the majority's footnotes distinguish between cases in which a court (1)

used a "prudent person" standard or imposed a general duty to investigate, and (2) used a plaintiff-specific standard while disavowing a general duty to investigate. *Ante,* at 72–75, nn. 10–12. But, courts in the first category did not always use the words "reasonable reliance" to describe their standard. See, *e. g., Horner* v. *Ahern,* 207 Va. 860, 863–864, 153 S. E. 2d 216, 219 (1967). Indeed, sometimes they used the word "justifiable." See, *e. g., Cudemo* v. *Al & Lou Construction Co.,* 54 App. Div. 2d 995, 996, 387 N. Y. S. 2d 929, 930 (1976). Nor did courts in the second category always use the words "justifiable reliance" to describe their standard. See, *e. g., Barnes* v. *Lopez,* 25 Ariz. App. 477, 480, 544 P. 2d 694, 697 (1976). Indeed, sometimes they used the words "reasonable reliance." See, *e. g., Johnson* v. *Owens,* 263 N. C. 754, 758–759, 140 S. E. 2d 311, 314 (1965). The relevant historical controversy in the law of fraud has focused not so much on labels as on the nature of the duty to investigate (*e. g.,* whether the duty is applicable normally or only in special, suspicious circumstances) and on the extent to which the law looks to the circumstances and capacities of a particular plaintiff. See Prosser & Keeton § 108. The Bankruptcy Court, as I have just pointed out, followed modern fraud law in both respects.

Fourth, while I understand that sometimes this Court might appropriately announce a legal standard and remand the case to the lower courts for application of the chosen standard, I do not agree that it should do so here. The record below is brief (87 pages of transcript plus exhibits). The Bankruptcy Judge's findings are reasonably clear. And, further litigation is expensive. Mr. Mans is bankrupt, representing himself until this Court appointed a lawyer for him; the Fields are not wealthy and should not be encouraged to pursue what is, in my view, the impossible dream of eventually recovering the $150,000 (minus legal fees). And, the example this Court sets by not looking more closely into the details of the case is not a happy one—particularly if it sug-

gests that appellate courts can, or should, insist that lower courts use commentator-approved technical terminology when the parties have not argued for its use and when that use seems most unlikely to have made any difference. Doing so simply generates unnecessary appeals, creating additional delay and expense in a system that could use less of both.

For these reasons, I dissent.