**In re Shirley WILLIS, Debtor.**

**FCC NATIONAL BANK, dba
First Card, Plaintiff,**

**v.**

**Shirley WILLIS, Defendant.**

**Bankruptcy No. 94–41630–ABF.
Adv. No. 95–4147.**

United States Bankruptcy Court,
W.D. Missouri,
Kansas City Division.

Jan. 16, 1996.

Mark J. Shultz, Gallas & Schultz, Kansas City, MO, for Plaintiff.

C. Carl Kimbrell, North Kansas City, MO, for Defendant.

### MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Plaintiff FCC National Card, dba First Card, ("First Card") filed this adversary proceeding to determine the dischargeability of an obligation in the amount of $6,824.50 incurred by debtor/defendant Shirley Willis ("debtor"). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find that debtor's obligations to First Card are dischargeable.

Debtor Shirley Willis graduated from high school in Missouri in 1988, and soon thereafter moved to California. She has no academic degree beyond high school. Over the years, she has collected credit cards. In October 1992, she obtained a credit card from First Card. There is no evidence of the original credit limit, but by 1995 her credit limit on such card was $6,000.00.

In 1993, debtor had income of $16,659.93. In 1994, her income was $18,001.51. Prior to February 21, 1995, she had no balance due and owing to First Card. Debtor, however, had credit card debt in excess of $29,000.00 on credit cards other than First Card by early February of 1995. At that time she was working at Coco's Restaurant in Concord, California. Under prevailing practice in the credit card industry, the card holder is required to pay a minimum of three percent of the outstanding balance of the card on a monthly basis. Debtor, who was grossing approximately $1,500.00 a month at that time, was paying approximately $850.00 per month in order to service the approximately $29,000.00 in credit card debt.

Despite being required to pay over fifty percent of her gross income to service her own credit card debt, on February 21, 1995, debtor took a $1,000.00 cash advance on her First Card and lent those funds to her roommate. Debtor stated her roommate had fallen behind in her bills and had borrowed money from debtor in the past which she had always repaid. The roommate has not, however, repaid this particular loan. On March 1, 1995, debtor made another $1,000.00 cash advance, using her First Card. She lent an additional $500.00 to the same roommate, and she used $500.00 to purchase furniture from her ex-boyfriend. By March 12, 1995, the total due and owing First Card had risen to $2,626.14.

On March 21, 1995, debtor left her job at Coco's. According to debtor, she needed to lower her monthly living expenses so that she could pay all her debts, after which she intended to go to college. She, therefore, decided to return to Missouri, where her sister lives. Her sister offered to provide debtor with room and board to enable debtor to eliminate her credit card debts with her additional disposable income. Debtor stated she had been promised a job at Chi–Chi's, a Mexican Restaurant in Kansas City, which is owned by the same corporation which owns Coco's. In order to return to Kansas City, move in with her sister, work at Chi–Chi's, and pay off her debts, she needed to get from California to Missouri.

Not surprisingly, debtor used her First Card to move from California to Kansas City. First, she charged an airline ticket for her brother, who came out to help her drive east with her things. Then she used the First Card to rent a truck, to pay for motels and gas, and to pay for food along the way. She also stopped to see the Grand Canyon, Las

Vegas, and other sites she had not ever been able to visit before. She and her brother reached Kansas City the first week of April 1995. When she called Chi–Chi's, she learned that she needed a special training program since she had not previously worked in a Mexican Restaurant. She was informed that she had just missed the cycle for enrollment in such program. She was, therefore, out of work for approximately two months. During that period of time, she continued to use her First Card to pay for her living expenses.

In the meantime, debtor's sister had two operations in March and April 1995, and was off work for six to seven weeks. As a result, debtor had to help out with her sister's expenses, rather than her sister providing debtor with room and board. Once again the First Card was used as a source of cash. By the April 12, 1995, billing, the balance had increased to $6,338.01, exceeding debtor's $6,000.00 credit limit.

Finally, on May 15, 1995, debtor began working at Chi–Chi's. During her training period, she was paid minimum wage. After the training period, she was paid $2.13 per hour, plus tips. Debtor claims that the tips averaged approximately $2.00 per hour. On June 11, 1995, she quit her job, and went to see a bankruptcy attorney. This Chapter 7 proceeding was filed on June 26, 1995. From February, 1995, until June 26, 1995, debtor's total credit card debt increased by approximately $11,000.00. Pursuant to her schedules, she owes a total of $39,159.87 to various credit card companies. First Card claims that debtor knew she was unable to meet her existing obligations as they became due at the time she made charges totalling $6,824.50 on her First Card. First Card, therefore asks this Court to find the debt nondischargeable. This case was tried on December 12, 1995.

■ Section 523(a)(2)(A) provides that a Chapter 7 discharge does not release a debt:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation or actual fraud, other than a statement representing the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). In order to succeed under section 523(a), the objecting party must prove each element of a particular section 523(a) discharge exception by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

■ To establish fraud under section 523(a)(2)(A), the following five elements must be proven:

1. That the debtor made representations;

2. That at the time the representations were made the debtor knew them to be false;

3. That the debtor made the representations with the intention and purpose of deceiving the creditor;

4. That the creditor justifiably relied on the representations;

5. That the creditor sustained the alleged injury as a proximate result of such representations. *Field v. Mans*, —— U.S. ——, —— n. 4, 116 S.Ct. 437, 440 n. 4, 133 L.Ed.2d 351 (1995); *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 342 (8th Cir.1987).

With respect to the first element, this court has held, as have others, that credit card use carries the implied representation that the buyer has the intention of repaying the charge. *FCC National Bank v. Bartlett (In re Bartlett)*, 128 B.R. 775, 779 (Bankr. W.D.Mo.1991); *Citicorp Credit Serv. v. Hinman (In re Hinman)*, 120 B.R. 1018, 1021 (Bankr.E.N.D.1990); See also, *Chase Manhattan Bank v. Carpenter (In re Carpenter)*, 53 B.R. 724, 727 (Bankr.N.D.Ga.1985) (noting that this is the majority view). Therefore, the first element is met here.

Courts have recognized that it is nearly impossible to adduce direct proof of an individual's knowledge, intention, and purpose. Therefore, case law has developed a list of objective or circumstantial factors which a creditor might use to prove the second and third elements. *See Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987); *Montgomery Ward and Co., Inc. v. Blackburn (In re Blackburn)*, 68 B.R. 870, 879 (Bankr.N.D.Ind.1987). These objective

or circumstantial factors, much like the "badges of fraud," are:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges are made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. The debtor's financial sophistication;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

*Sears, Roebuck, and Co., v. Faulk (In re Faulk),* 69 B.R. 743, 757 (Bankr.N.D.Ind. 1986); *Blackburn,* 68 B.R. at 880; *Chase Manhattan Bank v. Carpenter (In re Carpenter),* 53 B.R. 724, 730 (Bankr.N.D.Ga. 1985).

Having viewed the applicable factors, I have little problem concluding that at the time debtor incurred the obligations to First Card, she knew that she would be unable to repay such obligations, and that the representations she impliedly made in using her First Card were made with the intention and purpose of deceiving plaintiff into extending credit to her. Debtor incurred the bulk of these charges at a time when she was not employed. While unemployed there was a dramatic increase in her use of credit cards in general, and First Card in particular. She incurred over $11,000.00 in credit card debt between February, 1995, and June, 1995. Of that amount she incurred $6,824.50 of debt on her First Card. She exceeded her credit limit on her First Card, and multiple charges were made on a number of days. Debtor

attempted to demonstrate that her prospects for employment were good, because she testified that she had been promised a job as a waitress at a restaurant in Kansas City which was owned by the same corporation as her California employer. Perhaps, but the evidence shows that she had prepared two separate letters of recommendations to take to prospective employers in the Kansas City area. Since she was also out of work for approximately two months after leaving California, whatever her expectations, her prospects for immediate employment were less than assured at the time she returned to Missouri. For all of the above reasons, I find that debtor knew her representations of repayment to be false when she used her First Card, and she made such representations with the intention and purpose of deceiving plaintiff. Thus, the second and third elements are satisfied. As to the fifth element, I find that plaintiff sustained injury as a proximate result of debtor's representations.

The problem with plaintiff's case, however, is that it offered no evidence to satisfy the fourth element of fraud. In other words, First Card failed to demonstrate that it justifiably relied on the false representations made by debtor. Until recently, the law in the Eighth Circuit had been that the creditor seeking a determination of nondischargeability under section 523(a)(2)(A) need only prove that it "actually relied" on the false representation made by the debtor. *Thul v. Ophaug (In re Ophaug),* 827 F.2d 340, 342 n. 1 (8th Cir.1987). However, the Supreme Court decided *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), on November 28, 1995, prior to the date of the trial in this matter. In *Field,* the Supreme Court held that section 523(a)(2)(A) requires "justifiable" reliance. —— U.S. at ——, 116 S.Ct. at 446. Creditors must, therefore, now prove that they "justifiably relied" on a false representation.

When queried by the Court during closing argument, First Card's counsel contended that debtor had not raised the issue of reliance as an affirmative defense, so plaintiff did not need to offer proof as to such element. In the Complaint, however, First

Card contends that it "reasonably relied" on the false representations made by debtor. Doc. # 1, ¶ 11. The debtor denies that allegation in her Answer. Doc. # 5, ¶ 11. Plaintiff offered no proof as to this element. The burden is on the creditor to prove each and every element of a discharge exception by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

■ As indicated previously, each use of a credit card carries with it the implied representation that the debtor is willing and able to pay the charges incurred. Similarly, as to each such use, the creditor must prove that it justifiably relied on such implied representation. In other words, plaintiff must demonstrate that, at the time the debtor used the card, and made the implied representation, the creditor justifiably relied on that representation before accepting the charge. Here, plaintiff's counsel seemed to contend that plaintiff had relied on some unspecified representations by debtor in issuing her the credit card in 1992, and had the continuing right to rely on any representations which may have been made to it back then. The Supreme Court held in *Field* that in determining whether a creditor's reliance is justifiable, the court must look to all the facts available to plaintiff, and the sophistication of the plaintiff, and determine whether plaintiff should have realized that there might be some problem in extending credit. —— U.S. at ——, 116 S.Ct. at 444. The Court noted that a person is "required to use his senses, and cannot recover if he blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* (quoting Restatement (Second) of Torts (1976), § 541, Comment *a*).

■ In this case, Debtor had a total credit card debt of approximately $29,000.00 prior to using her First Card in February of 1995. In order to pay the minimum monthly charge on such balances, debtor was required to pay approximately $850.00 out of a gross monthly income of $1,500.00. Any creditor which knew of her financial condition in February, 1995, would not have been justified in relying on a representation by debtor that she intended to pay any new credit card debt she was piling up. During his closing argument, plaintiff's counsel conceded that his client does periodically obtain credit reports or similar information as to its customers' financial situations. Presumably, such information is used to increase credit limits. However, such information could be used to decrease or eliminate credit availability as well.[1] If a debtor's situation has changed, either because of a decline in earnings or an increase in obligations, a creditor who is aware of such change might not be justified in relying on debtor's implied representations of repayment. Such reliance is not justifiable if the creditor is "blindly [relying] on a misrepresentation the falsity of which would be patent to [it] if [it] had utilized [its] opportunity to make a cursory examination or investigation." *Id.*

■ At a minimum, *Field v. Mans*, requires that a creditor which relies on a debtor's representations to extend credit must show that such reliance was justified based on the facts available to the creditor at the time the card was used. Here, no evidence was offered to show what facts were available to plaintiff in or before February 1995, when extensive use of its card began. Since First Card offered no evidence to show that its reliance was justifiable, it has not met its burden under the fourth element, and the debt is dischargeable.

---

1. A recent article reports that as credit card debt continues to soar the big credit card companies have started getting credit bureau reports on their customers every few months to look for people who have suddenly taken on a a lot more debt. Saul Hansell, "A Shaky House of Plastic With No Quick Fix In Sight," **N.Y. Times**, Dec. 28, 1995, at C1.