**Ronald OWENS, Margaret Owens, Nicola Angelicola, Pasqualina Angelicola, Ernest Waterman, Plaintiffs,**

v.

**Kent W. MILLER, Defendant.**

**Ronald Owens, Margaret Owens, Nicola Angelicola, Pasqualina Angelicola, Ernest Waterman, Plaintiffs,**

v.

**Terry J. McGavern, Defendant.**

**Bankruptcy Nos. 98–41898, 98–45324. Adversary Nos. 98–4206, 99–4034.**

United States Bankruptcy Court, W.D. Missouri.

Oct. 25, 1999.

**8.** 11 U.S.C. § 1325(a)(4).

**9.** *Forbes v. Forbes (In re Forbes),* 215 B.R. 183, 188 (8th Cir. BAP 1997).

**10.** *Id.* at 190.

Jon D. Cohen, Chicago, IL, trustee.

Janice E. Stanton, Kansas City, MO, trustee.

Erlene W. Krigel, Kansas City, MO, trustee.

## MEMORANDUM OPINION AND ORDER

FRANK W. KOGER, Chief Judge.

Ronald Owens, Margaret Owens, Nicola Angelicola, Pasqualina Angelicola, and Ernest Waterman (collectively referred to as "Plaintiffs") filed related Complaints to Determine Dischargeability of Debt against two separate debtors, Kent W. Miller and Terry J. McGavern, under §§ 523(a)(2)(A) and 523(a)(4). The two adversary proceedings were ultimately consolidated and tried together in a two-day trial. All post-trial briefing is now completed, and the Court hereby issues the following Findings of Fact and Conclusions of Law as required under Fed.R.Bankr.P. 7052.

### Factual Background

The Plaintiffs in this case are retirees and their spouses from Rome Strip Steel, a steel mill near Utica, New York. Mrs. Owens had been a secretary at the mill; Mr. Waterman had been a mixer; and Mr. Angelicola had been an electrician. After they retired from the mill, the Plaintiffs each took their lump sum pension and profit sharing distributions which they had received from the mill to Andover Securities, Inc., an investment brokerage company near Utica, for purposes of investing the distributions for retirement.

All of the Plaintiffs were unsophisticated investors. Prior to going to Andover Securities and making the investments in question in this case, none of the Plaintiffs had any experience in investing in any sort of complicated investments. None of them have more than a high school education. In addition, the Angelicolas are immigrants from Italy and although they speak English, the transcripts of Mr. Angelicola's

David P. Hargrave, Kansas City, MO, for Miller.

Scott J. Goldstein, Kansas City, MO, for McGavern.

Michael H. Berman, Overland Park, KS, for plaintiffs.

testimony from the arbitration action indicate he speaks rather broken English.

Andover Securities, Inc., is a securities broker firm incorporated in Missouri and licensed by the National Association of Securities Dealers. At all times relevant herein, Defendant Kent W. Miller was Chairman of the Board of Andover Securities, Inc., and Defendant Terry J. McGavern was Andover's President and CEO. Andover Securities had a branch office in the Utica, New York, area which was operated by one of its vice-presidents, Gary Bohling, a registered representative of the firm licensed under its license in New York. Neither Miller nor McGavern worked out of the Utica office but rather monitored Bohling's operation from the home office here in Kansas City.

Each of the Plaintiffs went to see Mr. Bohling at Andover Securities' Utica office for purposes of investing their retirement savings. The Plaintiffs all allege that they clearly expressed to Bohling that they wished to invest their money in secure, low risk, income-producing investments for their retirement. Their stated investment objectives were preservation of principal and income production so as to provide enough income to sufficiently supplement their social security benefits during their retirement.

However, despite these stated investment objectives, Mr. Bohling invested significant amounts of the Plaintiffs' money in several limited partnerships, investment trusts, and private placement offerings of debt instruments, which are generally not considered to be low-risk investments suitable for retired clients whose stated objectives are principal preservation and income production. Because the Defendants concede that these investments were not suitable for the Plaintiffs, it is not necessary to describe the nature of each of the questionable investments here in detail.

However, as an example, one investment in which each of the Plaintiffs herein lost money and in which the Plaintiffs collectively lost the largest amount of money (and to which the most amount of time was devoted to at trial) was an investment referred to as the Towers Financial Promissory Notes. This investment has been described as "a private placement offering of debt instruments, which were part of the huge, highly leveraged Towers Credit companies' scheme; Towers operated as a factor or collection agent for receivables of companies in various industries."[1]

Because of the complicated and relatively risky nature of investments such as the Towers investment, securities regulations provide certain restrictions as to what kinds of investors are eligible to purchase an interest in this type of investment. Specifically, for this purpose, investors are divided into two groups: (1) "accredited investors," described as those investors who either have a net worth in excess of $1,000,000 or who have at least two years of income in excess of $200,000 per year; and (2) "unaccredited investors," described by Mr. Bohling as "anyone else." In the case of the Towers investment, only 35 of its investors could be unaccredited. Consequently, after 35 unaccredited investors bought an interest in the Towers investment, all other investors had to be accredited in order to purchase an interest. As Mr. Bohling described it, because only a small percentage of investors qualify as accredited investors,[2] when such an investment such as this one became available, there was a race among brokers to fill the unaccredited slots.

That being the case, Mr. Bohling admitted and the documentary evidence plainly

---

1. This description comes from the Amended Statement of Claim in arbitration before the National Association of Securities Dealers which resulted in the judgment giving rise to the Plaintiffs' claims against the debtors herein.

2. Mr. Bohling testified that roughly eight to ten percent of his clients would legitimately qualify as accredited investors.

shows that he manipulated some of his clients' financial statements and suitability forms so as to represent those clients as being accredited when in fact they were not. In some instances, he inflated the values of real estate listed on the financial statement above the actual value to show the client's net worth exceeded $1,000,000. In other clients' cases, including the Plaintiffs's cases herein, Mr. Bohling capitalized retirement and social security benefits, usually at 4%, thereby showing it as an asset on the client's financial statement. In other words, in the case of social security, entitlement to benefits was reflected on the financial statement as though it had a present cash value even though the right to social security benefits expected over a client's lifetime has no such present cash value. The Defendants do not dispute that Mr. Bohling's treatment of social security benefits in this manner is improper.

In addition, despite admittedly knowing that his clients' investment objectives were income production, in 1990 or 1991, Bohling started indicating on the documents that his clients' investment objectives were "speculation" (meaning higher-risk) rather than "income" because it had allegedly been suggested to him that doing so lessened his and the firm's exposure in the event the client's money was lost. By the end of his career with Andover, Bohling said he represented on all of his clients' documents that his clients' investment objectives were "speculation," regardless of what the client's true objective was.

Furthermore, Bohling admitted he told the Plaintiffs that the investments he was making on their behalf were low-risk. For example, as to the Towers investments, he told his clients that the dependability of income was "more reliable than social security." He also testified that he had compared the Towers Financial deal to Certificates of Deposit when he explained the investments to the Plaintiffs.

Ultimately, several of the entities in which Bohling had invested the Plaintiffs' money, particularly the Towers invest-ment, began to experience financial or legal trouble, and a large portion of the money Bohling invested on the Plaintiffs' behalf was lost. However, Bohling had already filed for bankruptcy protection under Chapter 11 at the time he lost the Plaintiff's money. As a result, the Plaintiffs entered a stipulation in Bohling's bankruptcy case agreeing to accept the sum of $12,000 as an administrative priority claim and agreeing not to sue Bohling for the balance. In exchange, Bohling agreed to provide the Plaintiffs with a sworn statement prior to the Plaintiffs' NASD arbitration proceedings against Andover Securities and Miller and McGavern.

On September 21, 1994, the Plaintiffs filed a Statement of Claim with the NASD asserting claims against Andover Securities, Miller, and McGavern and seeking arbitration before the NASD. On June 30, 1997, the NASD-appointed arbitrators entered their written award against Andover Securities, Miller and McGavern, jointly and severally, and in favor of Margaret and Ronald Owens in the amount of $72,000; Nicola and Pasqualina Angelicola in the amount of $84,000; and Ernest Waterman in the amount of $70,000, all bearing interest at 9%. The Plaintiffs' requests for punitive damages were denied. On June 30, 1998, the arbitration award was confirmed by the United States District Court for the Northern District of New York.

Miller and McGavern filed voluntary petitions for bankruptcy relief under Chapter 7 of the Bankruptcy Code on May 8, 1998, and December 14, 1998, respectively. Each of them listed the awards owed to the Plaintiffs as debts to be discharged in their respective bankruptcies. As a result, the Plaintiffs filed these adversary actions to have their claims declared nondischargeable.

In this action, the Plaintiffs seek to have Miller and McGavern's debts to them in relation to the losses of their retirement savings declared nondischargeable under

§§ 523(a)(2)(A) or (a)(4). They assert two bases for nondischargeability under these provisions: (1) Miller and McGavern should be held vicariously liable for the fraud committed by Bohling under an agency theory; and (2) Miller and McGavern directly participated and knowingly aided in the underlying fraud.

### Motion for Directed Verdict as to Plaintiffs Owens and Angelicola

■ At the close of the Plaintiffs' case at trial, the defense moved for a directed verdict against the Owens and Angelicolas on the ground that they did not appear personally at the trial before this Court. Counsel for the Plaintiffs responded to the oral motion, stating that Mr. Angelicola was not present in Kansas City for the trial because he is elderly and is physically unable to travel at this point. Although Mr. and Mrs. Owens were physically capable of traveling, they are required to work now (post-retirement) because of the loss of their retirement savings, the very subject of this adversary action. Counsel pointed out that Mrs. Owens' and Mr. Angelicola's sworn testimony from the earlier proceedings had been admitted into evidence and that if the Defendants had desired further testimony, counsel could have (and should have) either deposed these Plaintiffs while the attorneys were in New York taking Mr. Bohling's videotaped deposition or subpoenaed the Plaintiffs to appear at the trial in Kansas City. The Court took the motion for directed verdict with the case.

As the Court indicated it would do at trial, the Court hereby denies the motion for directed verdict. As Plaintiffs' counsel pointed out, these Plaintiffs were physically or economically unable to come to Kansas City; their sworn testimony was admitted into evidence; defense counsel had ample opportunity to depose them in New York; and they were not subpoenaed to appear here at trial. This case has been pending, in one form or another, for several years. These Plaintiffs have had to appear at numerous depositions, arbitration proceedings and trials. Under the circumstances, the Court finds their absence did not prejudice the defense and since they were not ordered or subpoenaed to be here, their absence from the trial does not entitle the defense to a directed verdict. That motion is, therefore, denied.

### Collateral Estoppel

■ The Plaintiffs assert that the Defendants should be collaterally estopped from relitigating the issues of fraud and breach of fiduciary duty because those issues were determined in the NASD arbitrators' decision. The Eighth Circuit has held that in order for collateral estoppel to be applied in a proceeding to determine the dischargeability of a debt, such as this one, the following requirements must be met:

> (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been litigated in the prior action; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.

*Johnson v. Miera,* 926 F.2d 741, 743 (8th Cir.1991) (*citing Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991)). As Plaintiffs suggest, arbitral proceedings may constitute the basis for collateral estoppel if the arbitration proceeding affords the basic elements of an adjudicatory procedure. *See Wellons, Inc. v. T.E. Ibberson Co.,* 869 F.2d 1166, 1168 (8th Cir.1989); *American Federation of Television and Radio Artists Health and Retirement Funds v. WCCO Television, Inc.,* 934 F.2d 987, 991 (8th Cir.1991); *Tamari v. Bache & Co. (Lebanon) S.A.L.,* 637 F.Supp. 1333, 1336 (N.D.Ill.1986).

However, the arbitration claim in this case was brought in three counts (violations of the 1934 Securities and Exchange Act, breach of fiduciary duty, and common law fraud) and the arbitration award did not specify under which of the three

counts the award was based. Had the arbitration award contained any findings of fact or specified which of the three grounds upon which the arbitrators based its decision, collateral estoppel would likely have applied. Unfortunately, however, that was not the case.

■■■ Plaintiffs are correct that collateral estoppel may apply in cases where the underlying arbitration award does not make findings of fact. *See Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1361 (11th Cir.1985); *Wilbert Life Ins. Co. & Grace Cemetery Assoc. Perpetual Care Corp. v. Beckemeyer (In re Beckemeyer)*, 222 B.R. 318, 321 (Bankr. W.D.Tenn.1998) (the lack of a finding of fact is not fatal to the application of collateral estoppel if the finding is necessarily implied from the nature of the claim and award). However, in such a case, it must be shown that the requisite findings for nondischargeability must be "necessarily implied from the nature of the claim or award." *In re Beckemeyer*, 222 B.R. at 321 (*quoting Universal American Barge Corp. v. J–Chem, Inc.*, 946 F.2d 1131, 1137 (5th Cir.1991)). As one Court has phrased it, "[w]hen the issue for which preclusion is sought is the only rational one the factfinder could have found, then that issue is considered 'determined' by the factfinder, even if no explicit finding of that issue has been made." *Tamari v. Bache & Co.*, 637 F.Supp. at 1336–37. However, "the party asserting the preclusion of an issue bears the burden of showing 'with clarity and certainty' what was determined by the prior judgment." *Id.* (citations omitted).

Because the Plaintiffs in this case brought their arbitration claim in three counts and the because the arbiters failed to specify the basis or bases of the award or to make factual findings, the application of collateral estoppel is complicated in this

case.[3] Plaintiffs contend that an award under any one or all three of the counts would form the basis for nondischargeability and so it does not matter that the panel failed to specify which one it was relying upon. The Defendants, on the other hand, point out the differences between the bases for liability in the arbitration and nondischargeability under the Bankruptcy Code, and assert that collateral estoppel is not applicable because of those differences.

In any event, the Court determines that it is not necessary to make that analysis and to apply collateral estoppel here (and thus discuss the elements of each of the arbitration causes of action as a basis for collateral estoppel) because this Court finds that the Plaintiffs presented enough evidence at this trial to support a finding of nondischargeability under § 523(a)(2)(A).

■■■ The Court does find, however, that although nondischargeability itself under the Bankruptcy Code will not be "necessarily implied from the nature of the claim or award," two relative findings or conclusions *can* be necessarily implied from the arbiters' award, namely: (1) the investments resulting in the losses awarded by the panel were inappropriate for these investors; and (2) the calculation of damages sustained therefrom by each Plaintiff. Furthermore, no one seems to dispute either of these findings made by the arbitration panel. Thus, it is not necessary for this Court to re-decide those issues and will rely on the arbitration panel's award for those findings.

### Discussion

■■■ Section 523(a)(2)(A) provides, in pertinent part:

(a) A discharge under sections 727, 1141, 1228(a), 1228(b), or 1328(b) of this

---

**3.** Had the arbitration panel specified upon which of the causes of action it was basing its award, *In re Beckemeyer* would have been directly on point for the application of collateral estoppel to the issue of nondischargeabil-

ity of the debts in this case. Unfortunately however, unlike *Beckemeyer*, the arbiters in this case did not specify the grounds on which they found liability.

title does not discharge an individual debtor from any debt—

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). In order to prevail under § 523(a)(2)(A), the creditor must prove, by a preponderance of the evidence: (1) that the debtor made the representation; (2) that he made the representation at a time when he knew the representation was false; (3) that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representation; and (5) that the creditor sustained a loss as the proximate result of the representations having been made. *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 342 n. 1 (8th Cir.1987), *as supplemented by Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *see also Green Tree Fin. Corp. v. Beasley (In re Beasley)*, 202 B.R. 979, 983 (Bankr. W.D.Mo.1996).

▪ It is undisputed that neither Miller nor McGavern ever personally made any misrepresentations to the Plaintiffs in this case. As such, nondischargeability as to them would have to be based on the fraud of Mr. Bohling. Several courts, including this one, have held that fraud on the part of an agent may be imputed to the debtor for purposes of determining dischargeability of a debt owed to a person defrauded. *See In re Walker (Walker I)*, 726 F.2d 452 (8th Cir.1984); *In re Walker (Walker II)*, 53 B.R. 174 (Bankr.W.D.Mo.1985); *In re Guse*, 150 B.R. 950 (Bankr.E.D.Mo.1993); *In re Croft*, 150 B.R. 955 (Bankr.E.D.Mo. 1993); *Green Tree Fin. Corp. v. Beasley (In re Beasley)*, 202 B.R. 979 (Bankr. W.D.Mo.1996).

In *In re Beasley*, this Court was called upon to determine the dischargeability of a debt for which Mrs. Beasley was liable due to the fraud committed by her son who was also her agent. In that case, I held that according to the Eighth Circuit's opinion in *Walker I*, in order for an agent's fraud to be imputed to the debtor-principal for purposes of nondischargeability, the creditor is required to show that the debtor knew or should have known of the agent's fraud, or that he was recklessly indifferent to his agent's fraud. *In re Beasley*, 202 B.R. at 984. I further concluded:

> Although the bankruptcy court in *Walker II* criticized the Eighth Circuit's *Walker I* opinion, *Walker I* appears to still be the rule in the Eighth Circuit. However, post-*Walker*, a distinction has developed where the case involves actual fraud or misrepresentation of an agent acting within the scope of his employment or apparent authority. *See Guse*, 150 B.R. 950; *Croft*, 150 B.R. 955. In these particular cases, it is not necessary that the debtor as principal knew or should have known of the agent's fraud in order to have the agent's fraud imputed to her. *Guse*, 150 B.R. at 954; *Croft*, 150 B.R. at 959.

*In re Beasley*, 202 B.R. at 984.

▪ Under this analysis, if Bohling was Miller and McGavern's agent, then the debts would be nondischargeable if they knew or should have known or was recklessly indifferent to Bohling's fraud. Furthermore, if Bohling was acting within the scope of his employment or apparent authority, it is not even necessary to find that Miller and McGavern knew or should have known of Bohling's fraud in order to have his fraud imputed to them.

The issue of whether Bohling was the agent of the Defendants is discussed below. First, however, the Court must determine whether Bohling's conduct constitutes fraud under § 523(a)(2)(A) in the first place.

As to the first element of fraud under § 523(a)(2)(A), the Court finds that Bohl-

ing made representations to each of the Plaintiffs that he was investing their money in investments that were suitable to their qualifications as investors and suitable to their stated investment objectives. Among other things, Bohling testified that he knew the Plaintiffs were interested in low-risk, income producing investments for retirement. He testified that in terms of dependability, he told his clients that the income from the investments he was making for them was "more reliable than social security." He also testified that he had compared the Towers Financial deal to Certificates of Deposit when he explained the investments to the Plaintiffs. Thus, Bohling admittedly made representations to the Plaintiffs regarding the safety of these investments and their appropriateness for these clients' sophistication and investment objectives.

The Court further finds that these representations were false. Not only did the arbitration panel necessarily find that these investments were inappropriate for these investors (and the Court has determined that collateral estoppel should apply as to that issue as discussed above), the fact that Bohling was required to manipulate financial data and file false suitability forms and financial documents in order to qualify these investors for investments for which they were not actually qualified, clearly demonstrates that the investments were not suitable for these investors in terms of either their sophistication and experience, or their investment objectives. Thus, the Court finds that when Bohling represented to the Plaintiffs that he was investing their money in investments that were safe and suitable for them, those representations were false.

 Also, the Court finds Bohling made those misrepresentations with the intention and purpose of deceiving the Plaintiffs. "The intent element of § 523(a)(2)(A) does not require a finding of malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrep-

resentations in question." *The Merchants Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (8th Cir. BAP 1999) (citations omitted). Because "palpable evidence of the mental state of an individual is rarely, if ever, available," fraud under § 523(a)(2)(A) may be proved by direct as well as circumstantial evidence. *Id.* at 792 (citation omitted).

In the case at bar, the testimony and evidence indicate that Bohling began to incorporate questionable practices into his operation as early as 1982 or 1983. He testified that he started, allegedly at McGavern's suggestion, by inflating the values of real estate to make an unaccredited investor appear to be accredited, and although he said he usually tried not to misrepresent values on clients' documentation, he would do so if he had to get an investment made. He also then admitted that over the next ten years, the frequency with which he inflated values to qualify a client for an investment increased.

In addition, at some point, Bohling testified he saw an article in a trade journal that suggested that brokers could capitalize school retirement benefits and list them as an asset for investment purposes. Bohling testified that after showing the article to Miller and McGavern (who, according to Bohling, thought it was an interesting idea but they were not sure whether they agreed that it was an acceptable practice), Bohling "wrestled" with the idea of capitalizing retirement benefits for a year because he knew it was a "gray area." However, he testified that after he considered his own entitlement to social security (and his own frustration with having to pay into social security each year), he decided that his own entitlement to social security benefits for the rest of his life after he retires was "worth something," even though he could not get his hands on the money now. He decided at that time that although a social security recipient can never receive the cash value of the future right to benefits, capitalizing social security benefits for purposes of

qualifying an investor for an accredited investment was a good idea. As a result, although he believed it was a "gray area," he started capitalizing both retirement benefits and social security benefits to make his investors appear to be accredited when in fact they were not.

In addition, Bohling testified that, pursuant to Miller and McGavern's suggestion at a meeting, he began to indicate on all of his clients' documents that the clients' investment objectives were "speculation" even in cases where the client plainly expressed another objective. Mr. Bohling described a speculative investment as a "crap shoot" and testified that very few investors' objectives is truly speculation. Bohling testified that most of his clients, including the Plaintiffs in this case, clearly expressed that their investment objectives were income production and that safety of principle was extremely important to them. Nevertheless, Bohling indicated on the documents that their objectives were "speculation" so as to protect himself and Andover from liability for losses resulting from the investments he made on his clients' behalf.

Bohling also testified that he often had his clients sign the documents blank so that he could fill in the amounts later. He also admitted that he did not always explain or discuss each and every page of the investment documentation with his clients, particularly the ones who were not sophisticated enough to understand the investment.

It is also significant to note that Bohling testified that he was particularly interested in selling the types of investments at issue here (such as limited partnership investments) because the commissions were good, they required less paperwork than other investments, and because they presented less risk to himself than regularly-traded securities did.

In sum, Bohling testified that toward the end of his career with Andover, he was indicating on all of his subscription forms and other documents that his clients' investment objectives were speculative, regardless of the client's expressed objective, so as to protect himself and Andover from liability. Furthermore, he testified that by the end of his career with Andover, his representations as to value of assets began to get more and more inflated and he improperly capitalized retirement and social security benefits more and more frequently over the last several years. He represented to his clients that he was investing their money in investments that were suitable for them when, in fact, they were not. In essence, the evidence suggests that over the ten year period between 1983 and 1993, Bohling's practices were slipping more and more from the "gray areas" into areas that were clearly improper and illegal.

Meanwhile, in October of 1990, Bohling filed a petition for bankruptcy relief. In addition, in 1991, the Securities and Exchange Commission began a private investigation into the Towers Financial Corporation and subpoenaed Bohling to appear before the SEC and to produce documentation relating to the investments he sold in Towers.

Then, on January 16, 1992, Rosemarie L. Koss, a client of Bohling's from 1983 to 1991, filed a Statement of Claim against Andover Securities, Miller, and McGavern with the NASD, wherein she alleged, among other things, that despite his representations to her that he was investing her money in liquid, no-risk investments pursuant to her expressed investment objectives, Bohling had invested her money in speculative low-grade bonds, high-risk gold certificates, and highly-speculative securities offerings. Arbitration on this claim commenced in May of 1992.

As a result of these events, on June 18, 1992, McGavern and Miller sent Bohling a letter in which they informed him that "[i]n light of recent developments that have brought [Bohling's] investment practices into question," Bohling was to limit the investments he solicited to a select list

of lower-risk investments pre-approved by Andover. Further, Bohling was told to refrain from soliciting his clients for high-risk investments which were "not the kind of investments that fit most clients' risk tolerance," specifically naming, among others, the Towers investment.[4]

On January 8, 1993, the arbitration panel entered its award against Andover Securities, Miller, and McGavern, jointly and severally, and in favor of Ms. Koss in the amount of $127,321.00 plus interest.

Finally, on February 10, 1993, an article appeared in the *Wall Street Journal* which reported that the SEC was alleging that 26 customers of Gary Bohling had declared on their questionnaires that they had assets over $1 million even though they did not have such assets, and that in each case, the SEC said that the investors used an improper estimate, supplied by Mr. Bohling, of the present value of their future social security and pension benefits. The article reported that Mr. Bohling had not responded to the messages left by the reporter on his answering machine.

On March 26, 1993, Gary Bohling voluntarily terminated his employment relationship with Andover Securities.

In light of this evidence, this Court finds that Bohling's escalating improper and illegal practices which were designed to sell more of these kinds of riskier investments to clients who were not qualified to invest in such items, and which produced better commissions for himself and his firm, at a time when his personal finances and career were deteriorating, are strong evidence of his intent to deceive the investors whose money he lost. Since it is impossible for this Court to look inside a person's thoughts to determine whether there was fraudulent intent, the Court must look to the surrounding circumstances to see if it appears as though actions were taken with fraudulent intent. *In re Beasley*, 202 B.R.

at 983 (*citing In re Willis*, 190 B.R. 866, 868 (Bankr.W.D.Mo.1996)); *see also In re Moen*, 238 B.R. at 792. The Court finds that the circumstances surrounding Bohling's actions in selling these investments to the Plaintiffs indicate they were taken with fraudulent intent.

The Court further finds that the Plaintiffs in this case justifiably relied upon Bohling's representations as to what he was going to do with their money. Although the Plaintiffs' signing documents that were either blank or overstated their assets may tend to negate a finding of justifiable reliance upon Bohling's misrepresentations, the Court must consider the facts available to the Plaintiffs at the time, as well as the Plaintiffs' lack of education and sophistication, in making such investments. *See In re Willis*, 190 B.R. 866, 870 (Bankr.W.D.Mo.1996), *aff'd FCC Nat'l Bank v. Willis*, 200 B.R. 868 (W.D.Mo. 1996) (*citing Field v. Mans*, 516 U.S. at 69–72, 116 S.Ct. at 444).

The very purpose of the regulations requiring that people who invest in these kinds of riskier investments be accredited is to protect unsophisticated investors such as the Plaintiffs herein. Bohling repeatedly and specifically testified that these Plaintiffs were very unsophisticated investors and the other evidence supports the conclusion that these investors were extremely unsophisticated.

The fact that these investors were unsophisticated and unqualified to invest in these deals is the very reason Bohling was required to falsify their documents. In fact, even if Bohling told some of them that he was increasing the represented values of their assets and capitalizing their social security (as Bohling said he did in some cases), the evidence and testimony before this Court and the arbitration panel which was introduced at trial here indicate

---

4. Although Andover never produced such a list of approved investments, the letter very clearly stated that Bohling was to refrain from selling higher-risk investments, specifi-

cally including Towers. In other words, it should have been clear to everyone involved that Bohling was to be extremely careful with his practice.

it is unlikely that the Plaintiffs in this case could have truly understood what Bohling meant by that, much less comprehended the ramifications of doing so.

Furthermore, Mr. Bohling was a registered broker working for what the Plaintiffs believed to be a reputable securities brokerage firm and the Plaintiffs herein had no reason to suspect that his dealings were shady. As a result, the Court finds that the Plaintiffs' reliance on Bohling's representations to him were justifiable.

Finally, the Plaintiffs obviously suffered a loss due to Bohling's investing their retirement savings in high-risk investments. Because the arbitration panel has already made findings as to the issue of the amount of damages sustained as a result of Bohling's misdeeds and this Court has determined that collateral estoppel is appropriate as to that issue, this Court will refer to the arbitration award for that purpose.

■ Thus, having found that Bohling committed fraud against the Plaintiffs under § 523(a)(2)(A), the next issue is whether Bohling's fraud can be imputed to Miller and McGavern. As discussed above, if Bohling was Miller and McGavern's agent, then the debts are nondischargeable if they knew or should have known of Bohling's fraud. Furthermore, if he was acting within the scope of his employment or apparent authority, it is not even necessary for this Court to find that Miller and McGavern knew or should have known of Bohling's fraud in order to have his fraud imputed to them.

■ Defendants naturally assert that Bohling is not their agent. They point out that as a broker employed by Andover Securities, Bohling was the agent of Andover Securities, and absent a finding under an alter ego theory or piercing the corporate veil, he was not the agent of either Miller or McGavern as principals of the corporation. Under normal circumstances, this would be true: generally, an agent of a corporation is not the agent of the corporation's principals. However, this Court finds that the particular securities laws involved in this case provide an exception to this general rule.

Section 20(a) of the Securities Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Thus, under these securities regulations, if Miller and McGavern are "controlling persons," they would be liable for damages caused by Bohling's violation of a securities regulation, jointly and severally, and to the same extent as Bohling, unless they could show they acted in good faith and did not directly or indirectly induce Bohling's fraud.

The Court finds that the evidence presented before the arbitration panel and this panel show that Bohling violated § 10b of the 1934 Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. Rule 10b–5, which implements 15 U.S.C. § 78j, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . .
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon

any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. "The essential components of a Rule 10b–5 claim are scienter, causation, and damages." *Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1327 (8th Cir.1991).

This Court concludes that the findings made in the § 523(a)(2)(A) discussion above also support a finding of each of the essential components of a Rule 10b–5 violation as well. The Court has already found Bohling intended to defraud the Plaintiffs (which satisfies the scienter requirement). Furthermore, in order to satisfy the causation element of a Rule 10b–5 violation, the plaintiff must prove that the allegedly fraudulent acts caused the plaintiff to purchase the relevant securities and that the allegedly fraudulent acts caused the plaintiff's economic harm. *Id.* at 1327–28. Again, this Court finds that Bohling's misrepresentations as to the appropriateness of the relevant investments to the Plaintiffs caused them to purchase these securities and that this caused them economic harm. Thus, by finding that Bohling committed fraud under § 523(a)(2)(A) by investing the Plaintiffs' money in the improper investments, the elements of a Rule 10b–5 violation have also been satisfied.

As a result, § 20(a)'s control person liability is implicated. A control person relationship exists whenever (i) the alleged control person actually exercised control over the general operations of the primary violator and (ii) the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated. *Farley v. Henson*, 11 F.3d 827, 835 (8th Cir.1993). Not only does the evidence presented at trial lead to the conclusion that Miller and McGavern satisfy this test in that they exercised control over the Bohling's general operations and that they possessed the power to stop Bohling's practice of falsifying documents and selling investments to unqualified investors, but Miller and McGavern also have not disputed that they are control persons under that provision.

Rather, the Defendants assert that they fall within the good faith exception to control person liability under § 20(a). The good faith exception to control person liability is an affirmative defense under which, as Defendants' counsel suggested at trial, the Defendants are required "to show at least that [they have] not been negligent in supervision … and that [they have] maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel." *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2nd Cir.1980); *see also Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 886 (S.D.N.Y.1986) ("the appropriate standard of conscious culpability for controlling person liability is mere negligence").

This Court finds that the Defendants were, in fact, negligent in their supervision of Bohling. Although they apparently had a system in place whereby Bohling's documentation was to be sent to the Kansas City office and reviewed by Miller, Miller either did not do so or he ignored the misrepresentations contained in those documents. The documents plainly showed that Bohling was capitalizing retirement and social security benefits; they were internally inconsistent; and as Bohling testified, by the end of his career, all of his documents inappropriately reflected that his clients had "speculative" investment objectives.

This case does not involve an isolated occurrence involving falsification of documents. Rather, Bohling was falsifying numerous documents pertaining to numerous clients. As noted above, the *Wall Street Journal* reported that Bohling had capitalized social security in at least 26 clients's cases as to the Towers investment alone, and Bohling admitted he engaged in this practice rather frequently.

Moreover, the parties testified that Bohling presented the idea of capitalizing retirement and social security benefits to Miller and McGavern before he started using that practice. Although the Defendants say they never endorsed such practice, they were at least on notice that Bohling was considering doing so. Furthermore, when Ms. Koss' complaints came to light, Miller and McGavern were plainly on notice that something questionable may be going on in Bohling's office. The Defendants suggest that Ms. Koss' arbitration did not commence until May of 1992, and that Miller reviewed all of the Plaintiffs' subscription documents prior to April 1, 1992, thereby suggesting that the Koss case did not put the Defendants on notice of a problem. However, Ms. Koss actually filed her Statement of Claim with the NASD on January 16, 1992, prior to the relevant subscription documents being sent to the home office for review. Although the Defendants testified that they did not put a lot of credence into Ms. Koss' original allegations, they were certainly on notice of a problem, and as this Court expressed at trial, it strikes the Court that when you have a formal complaint against one of your brokers, this is someone you want to monitor rather closely. Miller in fact concedes that "he missed some inconsistencies and red flags in the documents and that he may have been negligent in performing his supervision duties over Bohling as to these documents."

In addition, Bohling testified that he continued to sell Towers and other similar investments even after he received the letter from Miller and McGavern informing him that in light of the developments calling his practices into question, he was to stop selling these kinds of investments. Miller and McGavern never provided him with a list of approved investments and they apparently never looked into whether he was still selling the specifically listed investments that were prohibited.

Finally, the Plaintiffs presented the testimony of an expert witness, Mr. R. Gerald Baker, who testified that in his opinion, the Defendants either had knowledge of or

had sufficient information to have known of Bohling's improper practices and that they had a duty to either prevent that activity from occurring or to take steps to deter its continued occurrence. He also testified that it was his opinion that once they discovered Bohling's fraud, Miller and McGavern had a duty to take appropriate remedial steps with respect to the investors that may have been harmed by it.

In light of this evidence, even assuming Miller and McGavern did not actively promote Bohling's use of these questionable practices, this Court finds that Miller and McGavern were negligent in their supervision of Bohling. As a result, they are liable as control persons to the same extent as Bohling is.

That being the case, the Court finds that under these securities regulations, Bohling's fraud can be imputed to Defendants Miller and McGavern.

Defendants assert that because § 20(a) imposes liability based on mere negligence of the controlling persons, *see Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 886 (S.D.N.Y.1986), nondischargeability under § 523(a)(2)(A) cannot be based on liability under that section because negligence does not satisfy the requirements of § 523(a)(2)(A).

This Court agrees with Defendants that negligence does not meet the standard for fraud under § 523(a)(2)(A). However, negligence *does* meet the standard for liability based on the fraud committed by an agent. In other words, by finding that § 20(a) of the Securities Exchange Act imposes an agency-like relationship between Bohling and Miller and McGavern, this Court need not find that Miller and McGavern committed fraud themselves under § 523(a)(2)(A). Rather, since the Court found that Bohling committed fraud under § 523(a)(2)(A), and found that § 20(a) creates an agency-type relationship between him and the Defendants, this Court need only find that Miller and McGavern knew or should have known or were recklessly indifferent to Bohling's fraud. In fact, as discussed above, if Bohl-

ing was acting within the scope of his employment or agency, which he arguably was, this Court need not even find that Miller and McGavern knew or should have known of Bohling's fraud.

In any event, this Court finds that Miller and McGavern either knew or should have known of Bohling's fraud. The documentation containing the social security capitalizations, inflated real estate values, and misrepresentations regarding investment objectives went through the Kansas City office. Miller reviewed Bohling's subscription documents to determine whether the clients were accredited. Miller concedes that "he missed some inconsistencies and red flags in the documents and that he may have been negligent in performing his supervision duties over Bohling as to these documents." Furthermore, although neither Miller nor McGavern ever expressly endorsed Bohling's practice of capitalizing social security, the topic had been discussed and they should have thus been alerted to the fact that Bohling may have been doing this. Moreover, McGavern, who was Miller's supervisor, testified that he may have conveyed the impression to his brokers that it was permissible to sell unaccredited investors "a little bit" of the higher risk investments, regardless of the client's stated investment objectives.

Furthermore, as described above, after Ms. Koss voiced her complaints to Andover and filed for arbitration, Miller and McGavern sent Bohling a letter advising him not to sell these riskier types of investments, specifically naming the Towers investment, to his clients without prior approval. The letter clearly suggests that Miller and McGavern would be monitoring Bohling's practices more closely. Nevertheless, Bohling continued to sell the riskier investments, including Towers, to his unaccredited clients.

Again, this evidence amply satisfies the requirement that Miller and McGavern knew or should have known about Bohling's fraud. That being the case, Bohling's § 523(a)(2)(A) fraud may be imputed to them for purposes of nondischargeability.

Defendants assert that there is no reported case by any federal court finding nondischargeability under § 523(a)(2)(A) on the basis of controlling person liability. However, the absence of such precedent does not mean it is error for this Court to so hold. Defendants cite no authority, and this Court found none, holding that such a result is impermissible.

Because the Court has determined that the debts to the Plaintiffs are nondischargeable under § 523(a)(2)(A), it is not necessary to determine dischargeability under § 523(a)(4) as well.

*Conclusion*

For the foregoing reasons, the debtors' debts to Plaintiffs Ronald Owens, Margaret Owens, Nicola Angelicola, Pasqualina Angelicola, and Ernest Waterman are declared nondischargeable under § 523(a)(2)(A) due to the fraud of their agent.

The foregoing Memorandum Opinion constituted Findings of Fact and Conclusions of Law as required by Fed. R.Bankr.P. 7052.