In the Matter of Louise
JACKSON, Debtor.

Beatrice Hall, Plaintiff,

v.

Louise Jackson, Defendant.

Bankruptcy No. 05–53649 RFH.
Adversary No. 05–5170.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Aug. 23, 2006.

Terry J. Marlowe, T. Lee Bishop, Jr., Albany, GA, for Plaintiff.

Jason M. Orenstein, Macon, GA, for Defendant.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, JR., Chief Judge.

Beatrice Hall, Plaintiff, filed on December 12, 2005, a Complaint For Exception To Discharge Under Section 523. Louise Jackson, Defendant, filed a response and asserted a counterclaim on January 6, 2006. Plaintiff did not file a response to the counterclaim. Defendant asks the Court to rule on her counterclaim if the Court determines that her obligation to Plaintiff is dischargeable in bankruptcy. Plaintiff's complaint came on for trial on May 31, 2006. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

Plaintiff and Defendant are sisters. Plaintiff is fifty-one years old and has lived in Detroit, Michigan her entire life. Plaintiff has been totally disabled since 1994.

Defendant is fifty-three years old. Defendant was living in Detroit in 2002. Plaintiff made a loan to Defendant. Defendant repaid the loan in 2002 by selling her residence in Detroit.

Defendant moved to Macon County, Georgia on September 28, 2002. Defendant's daughter was incarcerated in Georgia. Defendant was the guardian of her daughter's two minor children. Defendant also wanted to live near her elderly mother who was living in Macon County.

After moving to Georgia, Defendant worked at the Crisp County Hospital for thirteen months. Defendant was fired in late 2003. Defendant needed financial help. Plaintiff started allowing Defendant to use Plaintiff's credit cards in November of 2003. Plaintiff and Defendant refer to this as the "loans." The loans continued until January of 2005.

Defendant, after being fired by the Crisp County Hospital, worked at the Sumter Regional Hospital on weekends for

one year. Defendant also worked part-time, Monday through Friday, at the Macon County High School. Defendant's monthly "bring home" pay was $800 from her employment at the high school.

Defendant's residence was a double-wide mobile home on a small parcel of land in Macon County. Defendant also owned two small parcels of land adjacent to her residence. Each of the three parcels was encumbered by loans from third parties.

Plaintiff and Defendant disagree as to how Defendant was to repay Plaintiff's loans. Plaintiff testified that Defendant promised to obtain a home equity loan or sell her residence in Macon County. Defendant testified that she never told Plaintiff that she would sell her residence. Defendant testified that she agreed to (1) purchase a life insurance policy and list Plaintiff as the beneficiary; and (2) obtain a home equity loan on her residence after Defendant had worked at the Macon County High School for two years. Defendant did take out a term life insurance policy with a $100,000 death benefit and listed Plaintiff as the beneficiary. Defendant was not able to obtain an equity loan on her residence. Defendant applied to four lenders for a home equity loan. Her applications were turned down.

Defendant testified that she tried without success to sell the two parcels of land adjacent to her residence. Defendant placed advertisements in the newspaper but did not list the parcels with a realtor.

Defendant sent a number of letters thanking Plaintiff for her help, asking Plaintiff for more help, and promising to repay Plaintiff. The letters were sent via faxsmile between May 19, 2004 and January 22, 2005. *Plaintiff's Exhibits 2,3,5,6,7,8.* Plaintiff testified that she received a "lot" of telephone calls from Defendant in which Defendant promised to obtain a home equity loan.

Defendant used Plaintiff's credit cards to make Defendant's house payments, car payments, and to pay living expenses. Defendant made some balance transfers between credit cards. Defendant made some charges on the credit cards at liquor stores.

Defendant used one of Plaintiff's credit cards to pay off the debt on Defendant's car, a 2000 Oldsmobile Alero. The payoff was $6,000. Defendant gave the car to her daughter. Defendant then purchased for her own use a 2003 Chevrolet Cavalier for $16,000. Defendant made a $500 down payment and financed the balance through a finance company. Plaintiff testified that Defendant used her credit card for the down payment.

Defendant sent Plaintiff a letter on October 10, 2004. Defendant stated that she had quit her job at the hospital because of her health. Defendant asked Plaintiff for financial help. Defendant stated that she would repay Plaintiff "someway, somehow." *Plaintiff's Exhibit 6.* Plaintiff testified that after receiving the letter she was concerned that Defendant could not repay the loans because Defendant was not working. Plaintiff, however, continued to make loans to Defendant.

Defendant sent Plaintiff a letter dated November 11, 2004 requesting a loan of $1,200 until Defendant received her income tax refund. Defendant, in the letter, stated that she needed the loan to make her house and car payments, and to pay her house insurance and her "light" bill. *Plaintiff's Exhibit 7.* Plaintiff made the $1,200 loan to Defendant. Defendant did not repay the loan when she received her income tax refund.

Defendant sent Plaintiff a letter on January 22, 2005. Defendant asked Plaintiff to "Please call one of these debt solution service[s] and put these 3 credit cards on it

because that's the only way I can make these payments on time. I'm very willing to pay them. I just don't make enough money." *Plaintiff's Exhibit 8*. When Plaintiff called the "services," she was told that debt consolidation was "next to bankruptcy." In January of 2005, Plaintiff stopped allowing Defendant to use her credit cards. Defendant testified that Plaintiff stopped talking to her. Plaintiff has been making the payments on her credit cards since January or February of 2005. The credit card obligations include the charges that Defendant made on Plaintiff's credit cards.

Plaintiff allowed Defendant to use some seventeen of Plaintiff's credit cards. Defendant used Plaintiff's credit cards from November of 2003 until January of 2005. Defendant does not dispute that her obligation to Plaintiff totals some $53,000.

Plaintiff filed a lawsuit in July of 2005 in state court seeking to recover the funds that Defendant charged on Plaintiff's credit cards. Defendant filed a petition under Chapter 7 of the Bankruptcy Code on September 9, 2005. Defendant surrendered her residence and the two adjacent parcels in her bankruptcy case.

On October 30, 2005 Defendant moved from Georgia to Detroit. Defendant testified that she moved because she could make more money in Detroit. Defendant's mother had died in September of 2005. Defendant's daughter had been released from prison and was living in Detroit. Defendant is currently living in Detroit.

Plaintiff testified that she would not have made the loans except for Defendant's promise that she would obtain a home equity loan or sell her residence. Plaintiff testified that she allowed Defendant to use the credit cards to make her

house payments because Defendant's residence was the way that Plaintiff was to be repaid. Plaintiff testified that she continued to allow Defendant to use her credit cards because Plaintiff was "too far in to stop."

Plaintiff and Defendant have seven other sisters. Defendant testified that Plaintiff was the only sister who would help her. Defendant made her last payment on Plaintiff's credit cards in March 2005. The evidence does not show how many prior payments Defendant made on Plaintiff's credit cards.

### CONCLUSIONS OF LAW

Plaintiff contends that Defendant's obligation is non-dischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.[1] This section provides:

§ 523. **Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C.A. § 523(a)(2)(A) (West 2004).

■ "For purposes of § 523(a)(2)(A) [of the Bankruptcy Code], a creditor must prove that (1) the debtor made a false representation with intent to deceive the creditor, (2) the creditor relied on the representation, (3) that his reliance was [justifiable], and (4) that the creditor sustained loss as a result of the representation." *St.*

---

[1]. At the trial of this adversary proceeding, Plaintiff did not pursue her contention that

Defendant's obligations arose through larceny or a willful and malicious injury.

*Laurent v. Ambrose, (In re St. Laurent),* 991 F.2d 672, 676 (11th Cir.1993); *see Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (justifiable reliance required under section 523(a)(2)(A)).

■ "In order to preclude the discharge of a particular debt because of a debtor's false representation, ... [t]he debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." *Schweig v. Hunter, (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986).

In *Sears Roebuck & Co. v. Faulk, (In re Faulk),*[2] the bankruptcy court stated:

"Actual" fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. However, fraud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact.

A "false pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation.

69 B.R. at 750.

*See also* 4 *Collier on Bankruptcy* ¶ 523.08[1][d], [e] (15th ed. rev.2006).

■ "Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case." *Devers v. Bank of Sheridan,* *Montana, (In re Devers),* 759 F.2d 751, 754 (9th Cir.1985).

*Collier on Bankruptcy* states:

The failure to perform a mere promise is not sufficient to make a debt non-dischargeable, even is there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions.

A misrepresentation by a debtor of his or her intention to perform contractual duties, however, may be a false representation under section 523(a)(2)(A). Thus, section 523(a)(2)(A) may make a creditor's claim nondischargeable if the debtor had no intention of performing any of the obligations under the contract. This intent may be inferred from the fact that the debtor failed to take any steps to perform under the contract.

. . .

The debtor's insolvency or inability to pay does not by itself provide a sufficient basis for inferring the debtor's intent. A debtor's honest belief that a debt would be repaid in the future, even if in hindsight found to have been very unrealistic, negates any fraudulent intent.

4 *Collier on Bankruptcy* ¶ 523.08[1][d] (15th ed. rev.2006).

■ Plaintiff has the burden of proving all facts essential to support her objection to dischargeability by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ Turning to the case at bar, Plaintiff testified that Defendant promised to repay the loans at issue by obtaining a home equity loan or by selling her residence in

---

**2.** 69 B.R. 743 (Bankr.N.D.Ind.1986).

**600**

Macon County.[3] The Court is persuaded that Plaintiff relied on this promise made by Defendant and that Plaintiff's reliance was justifiable. Defendant had repaid a prior loan in 2002 by selling her residence in Detroit. The Court though is not persuaded that Defendant had sufficient equity in her residence in Macon County to honor her promise. Plaintiff presented no evidence on Defendant's income or expenses except that Defendant's monthly "bring home" pay was $800 from her employment at the Macon County High School. The evidence does not show the value of or the debt on Defendant's residence or the two adjacent parcels of land. There is no evidence that Defendant represented to Plaintiff that Defendant had any equity in her residence. Defendant applied to four lenders for a home equity loan. Defendant's applications were turned down. Defendant attempted without success to sell the two parcels of land adjacent to her residence. Defendant surrendered her residence and the adjacent parcels in her bankruptcy case.

The evidence shows that Defendant was, on a regular basis, pleading for financial help from Plaintiff. The Court can only conclude that Plaintiff knew that Defendant was in severe financial distress. Plaintiff continued to make loans to Defendant.

Defendant was able to obtain financing to purchase a car, the 2003 Chevrolet Cavalier. Plaintiff contends that Defendant should have been able to obtain a home equity loan. As the Court has noted, Plaintiff has not shown that Defendant had any equity in her residence to borrow against.

■ The Court is persuaded that Defendant simply did not have the financial re-

sources to honor her promise to obtain a home equity loan or sell her residence. As stated by *Collier on Bankruptcy*, the failure to perform a mere promise is not sufficient to make a debt nondischargeable. The Court is persuaded that Defendant honestly intended to repay Plaintiff's loans. The Court from the evidence presented at trial finds no fraudulent intent on the part of Defendant. The Court is persuaded that Defendant's obligation is dischargeable under section 523(a)(2)(A).

■ Defendant, in her counterclaim, asks the Court for an award of attorney fees under Section 523(d) of the Bankruptcy Code. This section provides:

(d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C.A. § 523(d) (West 2004).

The Court is persuaded that an award of attorney fees is not appropriate. Plaintiff was justified in bringing her adversary proceeding even though she did not prevail on the merits.

An order in accordance with this memorandum opinion will be entered this date.

---

**3.** Defendant has a different recollection of her promise. The Court is persuaded that Plain-

tiff's testimony more accurately states the terms of Defendant's promise.